UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BRUCE TRACIA,
         Plaintiff,

v.

LIBERTY LIFE ASSURANCE COMPANY
OF BOSTON and COMCAST
CORPORATION LONG TERM DISABILITY
PLAN,
         Defendants.

Civil Action No. 1:13-cv-13248-JDG

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, Defendants, Liberty Life Assurance Company of Boston ("Liberty") and Comcast Comprehensive Health and Welfare Benefit Plan, incorrectly captioned as "Comcast Corporation Long Term Disability Plan," ("the Plan") (collectively "Defendants"), submit this Statement of Undisputed Material Facts In Support of Their Motion For Summary Judgment. Defendants state that the following are undisputed material facts taken from the pleadings of record, the Declaration of Paula McGee, and the Parties Agreed to Record For Judicial Review concerning Plaintiff Bruce Tracia's claim for disability benefits.[1]

### The Benefits Plan And Long Term Disability Insurance Policy

1.      Plaintiff Bruce Tracia ("Plaintiff") was hired by Comcast Cable Communication Management, LLC ("Comcast") on or about April 22, 1996. (AR000083)

2.      As part of his employment with Comcast, Plaintiff was offered coverage under the Plan. The Plan is an ERISA welfare employee benefit plan. (AR000001) Under the Plan, Plaintiff

---

[1] The Parties' Agreed To Record for Judicial Review, marked AR000001 – AR002535, was filed with the Court under seal on August 21, 2014. (ECF Nos. 19 & 20)  In order to conserve resources and to avoid unnecessary duplication, Defendants are not filing these documents again with the Declaration of Paula McGee, but can do so if requested by the Court.  References to pages within the Agreed To Record for Judicial Review will be made in the following form "AR_____".

was provided with disability benefits through a policy of insurance—policy no. GF3-830-502315-01 ("the Policy"). (AR000001-48)  Liberty issued the Policy to Comcast, which was effective as of June 1, 2005.  (AR000001)

3.      Section 7 ("General Provisions") of the Policy states: "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder.  Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding."  (AR000042)

4.      Section 4 of the Policy provides that, subject to other terms of Policy, a disability benefit "will be paid for the period of Disability if the Covered Person gives to Liberty Proof of continued: (1) Disability…."  (AR000022)  It further states that the long term disability benefit "will cease the earliest of:… (8) the date the Covered Person is no longer Disabled according to this policy…." (AR000035)

5.      Section 2 of the Policy, in relevant part, defines Proof as "the evidence in support of a claim for benefits and includes, but is not limited to, the following:…3. the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.  Proof must be submitted in a form or format satisfactory to Liberty."  (AR000013)

6.      Section 2 of the Policy, in relevant part, defines "Disability" or "Disabled" as follows:

b.      i.      if the Covered Person is eligible for the 12 Month Own Occupation benefit, "Disability" or "Disabled" means that during the Elimination Period and the next 12 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and

> ii.    thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

(AR000009)

7.    Section 2 of the Policy defines "Material and Substantial Duties" to mean "responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified."  (AR000011)

8.    Section 2 of the Policy defines "Any Occupation" to mean "any gainful occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity.  Gainful occupation means an occupation in which earnings are: equal to or greater than 80% of the Employee's pre-disability income; less than 80% of the Employee's average pre-disability income, but higher than the average earnings for the geographic area in which the Employee resides; or equal to or greater than the gross benefit."  (AR000007)

### Liberty Grants Plaintiff's Claim for Short Term Disability Benefits

9.    On May 10, 2011, Plaintiff—a Business Account Executive for Comcast—ceased working due to ankle related pain and submitted a claim for short term disability to Liberty. (AR000082, 2518-19, 2532-53)  In that role, Plaintiff indicated that he spent 90% of his time walking to visit customers.  (AR000068)

10.    On May 12, 2011, Liberty confirmed with Plaintiff's treating podiatrist, Dr. Drew Taft, that Plaintiff had been diagnosed with tarsal tunnel syndrome. (AR00081-82)

11.    On May 13, 2011, Liberty notified Plaintiff that it had approved his claim for short term disability benefits.  (AR002531)

12.    On May 25, 2011, Plaintiff provided Liberty with a letter from Dr. Taft, indicating that (1) Plaintiff was scheduled for surgery on June 3, 2011, (2) Plaintiff would need to remain out of work until June 27, 2011, and (3) Plaintiff was scheduled for a post-operative appointment on

3

June 10, 2011 (AR000081, 2522).   Liberty approved Plaintiff's claim through June 3, 2011. (AR000081)

13.     On June 6, 2011, Liberty confirmed with Dr. Taft's office that Plaintiff had surgery for tarsal tunnel syndrome on June 3, 2011.  (AR000080)    Liberty approved Plaintiff's claim through to Plaintiff's next scheduled office visit on June 13, 2011. (AR000079)

14.     On June 13, 2011, Plaintiff informed Liberty that his attending physician wanted him to be out of work until August 1, 2011.  (AR000079)  Liberty approved Plaintiff's claim through to Plaintiff's next scheduled office visit on June 22, 2011 and requested medical records from Dr. Taft. (AR000078-79, 2513-2515)

15.     On June 16, 2011, Liberty received a letter of restriction from Dr. Lee—who works in the same office as Dr. Taft—indicating that on June 3, 2011, Plaintiff had undergone revisional tarsal tunnel decompression surgery and that he should remain out of work for eight weeks. (AR000078, 2510)

16.     On June 22, 2011, Liberty received medical records from Dr. Taft consisting of office visit notes for June 6, 2011 and June 13, 2011.  (AR00078, 2504-2508)  Dr. Taft also provided a letter dated June 21, 2011 indicating that Plaintiff's treatment consisted of gradual return to protected weight bearing, physical therapy, pain control and that a return to work was expected in 6-8 weeks.  (AR002508)

17.     Liberty approved Plaintiff's claim through July 31, 2011. (AR000078)

18.     On July 5, 2011, Plaintiff informed Liberty that he had his stiches removed and that he could not walk or bear weight.  He also indicated that he had been referred to physical therapy. (AR000077)  Liberty approved Plaintiff's claim through to Plaintiff's next scheduled office visit with Dr. Taft on August 9, 2011.  (Id.)

4

19.     On July 19, 2011, Plaintiff informed Liberty that he was attending physical therapy, but that he had additional pain in his foot and that Dr. Taft had scheduled additional tests. (AR000077)

20.     On July 29, 2011, Plaintiff sent Liberty results of an MRI dated July 25, 2011 and a letter dated July 26, 2011 from Dr. Taft indicating that Dr. Taft had referred Plaintiff to a specialist, Dr. German Levin of New England Spinal Care Associates.  (AR000076, 2499-2501)

21.     On August 2, 2011, Plaintiff provided Liberty with a progress note dated August 2, 2011, from Dr. Levin.  The progress note indicates that Plaintiff's primary concern was left distal lower extremity pain, but also lower back and left proximal leg pain.  Plaintiff indicated that his pain was 10 out of 10.  (AR000076, 2496-2497) Dr. Levin opined that the MRI showed mild spondylotic changes in the lumbar spine and postsurgical changes, but that the MRI did not fully explain Plaintiff's symptoms.  (AR002497)  Dr. Levin's assessment was that Plaintiff's left distal lower extremity pain was "most likely secondary to chronic regional pain syndrome" and the chronic low back and left radicular pain was "most likely secondary mild lumbar spondylosis." (Id.)  Dr. Levin prescribed pain medication and recommended lumbar sympathetic blocks, which could be diagnostic as well as therapeutic.  (Id.)

22.     Liberty approved Plaintiff's claim through to Plaintiff's next scheduled office visit with Dr. Levin on August 15, 2011.  (AR000074)

23.     On August 16, 2011, Dr. Levin informed Liberty that Plaintiff was undergoing epidural injections, that he should remain out of work, and that he had a follow up appointment scheduled in four weeks.  (AR000074, 2494)   Liberty approved Plaintiff's claim through to Plaintiff's next scheduled office visit with Dr. Levin on September 20, 2011. (AR000074)

24.     On September 13, 2011, Plaintiff notified Liberty that this pain had increased and the prescribed medication was not effective.  (AR000073)  Plaintiff indicated that he had been referred

to the Massachusetts General Hospital ("MGH") Center for Pain Management and that Dr. Levin has suspended physical therapy. (Id.)

25.     On September 14, 2011, Liberty received medical records from Dr. Levin. (AR000073, 2490-92) Dr. Levin indicated that Plaintiff was unable to return to work until October 12, 2011 and that he had prescribed Plaintiff oxycodone for 30 days. (AR002490, 2492) Dr. Levin also provided Liberty with a letter from Plaintiff's physical therapist, Monica Sheridan, MSPT, who indicated that Plaintiff's treatment was "rather limited due to hypersensitivity" and that his foot symptoms are significantly reduced while lying prone but return when in a sitting positions.  Ms. Sheridan requested instruction from Dr. Levin regarding Plaintiff's plan of care.  (AR002491)

26.     On September 21, 2011, Plaintiff notified Liberty that he was scheduled to meet Dr. James P. Rathmell, at MGH Center for Pain Management on September 27, 2011.  (AR000073). Liberty approved Plaintiff's claim through to Plaintiff's scheduled office visit with Dr. Rathmell on September 27, 2011. (AR000073)

27.     On September 29, 2011, MGH contacted Liberty to inform them that Plaintiff was under Dr. Rathmell's care and that Plaintiff would conduct another nerve block procedure on October 5, 2011.  (AR000072, 2478)

28.     Liberty approved Plaintiff's claim through October 25, 2011. (AR000071)

29.     On October 5, 2011, Liberty received medical records from Dr. Taft, consisting of an office visit note dated July 19, 2011 and the June 3, 2011 operative report.  (AR000071, 2457-2462)

30.     On October 10, 2011, Liberty received medical information from Dr. Levin and his colleague Dr. Seyed A. Mostoufi consisting of notes regarding Plaintiff's August 8, 2011 and August 30, 2011 lumbar block injections and office visit notes for August 2, 2011, August 15, 2011, and September 13, 2011.  (AR000071, 2436-2449)  In the note dated September 13, 2011, Dr. Levin diagnosed Plaintiff with "Complex Regional Pain Syndrome – Leg", prescribed pain

medication, and suggested consultation at Massachusetts General Hospital's pain clinic for possible placement of an implantable device to relieve Plaintiff's symptoms.  (AR002436)

31.     On October 12, 2011, Liberty received Plaintiff's physical therapy notes from Excel Orthopedic Specialists for sessions occurring between July 18, 2011 and September 12, 2011. (AR000070, 2408-2424)  Excel Orthopedic Specialists later confirmed that Plaintiff's last physical therapy session was September 12, 2011. (AR000070)

32.     On October 25, 2011, Dr. Rathmell indicated that Plaintiff was still under his care and that his next appointment would be in four weeks.  (AR000070, 2396)

33.     On October 26, 2011, Plaintiff indicated that he would have a nerve device placed in the next few weeks.  (AR000070)  Liberty approved Plaintiff's claim through November 14, 2011. (AR000070)

### Liberty Grants Plaintiff's Claim for Long Term Disability Benefits

34.     On September 28, 2011, Liberty notified Plaintiff that Comcast's Short Term Disability Policy provided benefits for a maximum period of 26 weeks and that, if his disability continued through the maximum benefit period, the short term disability benefits would end on November 14, 2011.  (AR002479)  Liberty also informed Plaintiff that it would review his claim for consideration under the long term disability policy during the remainder of the short term disability benefit period. (Id.)

35.     On November 2, 2011, Liberty received medical records from MGH consisting of Dr. Rathmell's notes from Plaintiff's September 27, 2011 visit and the October 5, 2011 lumbar sympathetic block procedure.  (AR000066, 2384-2391) On the same date, it also received a consultation report from Ronald J. Kulich, Ph.D., who conducted a psychological evaluation of Plaintiff and opined that the contents of the report "would suggest no major psychological contraindications re spinal column stimulation."  (AR002379-81)

7

36.     On November 2, 2012, Liberty referred Plaintiff's claim file to an independent peer reviewer to determine the diagnoses causing impairment, the restrictions and limitations supported by medical evidence, and other relevant information.  (AR000066, 2375-76)

37.     On November 9, 2012, Liberty received a letter from Plaintiff's primary care physician, Dr. Emily Chin, indicating that Plaintiff needed to be placed on long term disability, summarizing his current treatment, and stating that Plaintiff would be having spinal cord surgery. (AR000066, 2373-74)

38.     On November 16, 2011, Liberty received medical records from MGH consisting of Dr. Rathmell's office note dated November 1, 2011.  (AR000065)  In that note, Dr. Rathmell noted that Plaintiff had Complex Regional Pain Syndrome ("CRPS") of the left foot and indicated that the lumbar sympathetic blocks had been ineffective.  (AR002371-72)  Dr. Rathmell's recommended plan of care consisted of refilling plaintiff's pain medication, proceeding with a trial of a spinal cord stimulator, and keeping Plaintiff from returning to work.  (AR002371-72)

39.     Liberty referred this additional information to the peer reviewer, Steven M. Lobel, M.D., Board certified in Physical Medicine & Rehabilitation/Pain Medicine and Physical Medicine & Rehabilitation. (AR000066, 2356-2360)

40.     After reviewing Plaintiff's entire claim file, Dr. Lobel issued a peer review report dated November 23, 2011.  (AR002356-60) In that report, Dr. Lobel opined that Plaintiff had a diagnosis of left leg CRPS following tarsal tunnel surgery and failure to respond to conservative care. (AR002358)

41.     Dr. Lobel indicated that Plaintiff had an impaired gait, impaired sensation, and CRPS related to pain and that his restrictions and limitations consisted of "no work until the condition is

treated."   (Id.)   With regard to treatment, Dr. Lobel indicated that Plaintiff's physician, Dr. Rathmell, recommended a spinal cord stimulation[2] (SCS) trial. (AR002357)

42.      Dr. Lobel explained that "[w]hile gainful employment is not currently supported for [Plaintiff] at this time, the documentation fails to support a complete inability to perform any work in the future following SCS." (AR002359)

43.      Dr. Lobel expected that after SCS Plaintiff would be able to return to work on a part-time basis for a two month period with various restrictions after an initial two week recovery period, and would be able to work full-time in a sedentary capacity within ten weeks of the surgery to implant the spinal cord stimulator. (Id.)

44.      By letter dated November 29, 2011, Liberty approved Plaintiff's claim for long term disability benefits, effective November 15, 2011. (AR002362-2363) In its November 29, 2011 letter, Liberty noted that Plaintiff's claim would be "evaluated periodically to determine ongoing disability" and that "approval at this time does not guarantee payments through the maximum benefit duration."  (AR002362)

45.      On November 30, 2011, Liberty informed Plaintiff that once he recovered from his surgery, Liberty would review his claim for ongoing benefits.  (AR000064)

**Liberty Continues to Evaluate Plaintiff's Claim for Long Term Disability Benefits**

46.      On January 24, 2012, Plaintiff notified Liberty that he had the spinal cord stimulator implant surgery on January 20, 2012.  (AR000064)

47.      On February 6, 2012, Plaintiff notified Liberty that he had developed a staph infection from the surgery and that the spinal cord stimulator was removed.  (AR000063)  Plaintiff indicated that the spinal cord stimulator was working and that he hoped to implant the stimulator again after he met with Dr. Rathmell on February 17, 2012.  (Id.)

---

[2] Spinal cord stimulation is treatment for back pain that uses a mild electric current to block nerve impulses in the spine.

48.     Plaintiff provided Liberty with a letter from Dr. Rathmell's colleague, Dr. Christopher Gilligan, dated February 1, 2012 indicating that at that time Plaintiff was hospitalized. (AR00002334)    Plaintiff also provided Liberty with discharge paperwork from MGH. (AR0002335-42)

49.     On March 23, 2012, Plaintiff informed Liberty that he underwent surgery on March 21, 2012 to implant another spinal cord stimulator. (AR000063)

50.     On April 23, 2012, Liberty received a "Certification By Health Care Provider" completed by Dr. Rathmell, indicating that Plaintiff has chronic lumbar radiculopathy-chronic low back and left leg pain and that he is unable to sit, stand, or walk for long periods without pain.  Dr. Rathmell referred Plaintiff to physical therapy and recommended that Plaintiff remain out of work for six weeks.  (AR000062, 2325-29)

51.     On May 1, 2012, Liberty received a "Certification By Health Care Provider" completed by Dr. Chin, indicating that Plaintiff had chronic low back pain and left radiculopathy. (AR000062, 2308-11)  Dr. Chin noted that Plaintiff could not "sit/stand/walk for more than 20 minutes" due to recurrence of pain and that Plaintiff could not perform "all functions requiring any period of sustained sitting/standing/walking/driving."   (AR0002309-10)   It also received a Restrictions Form completed by Dr. Chin and a copy of the July 25, 2011 MRI report.  (AR002303, 2305-6)

52.     On May 2, 2012, Liberty received medical records from Dr. Chin consisting of Plaintiff's chart summary, notes from office visits on April 19 and 24, 2012, anticoagulation reports dated March 23 26, 2012 and April 3, 12, and 20, 2012, lab reports dated March 31, 2012 and April 19, 2012, INR test results dated March 22, 25, 2012 and April 12, 2012, and Dr. Rathmell's March 20, 2012 operative report.  (AR000062, 2278-2301)

53.     In office visit note dated April 19, 2012, Dr. Chin indicated that the re-implanted spinal stimulator had caused mild improvement on the back/left leg pain and that Plaintiff's reported pain went from 10 to 8.  In that note, Dr. Chin also indicated that Plaintiff complained that, in his left leg, he experienced "sudden weakness and giving out without warning since surgery." (AR002286)  Plaintiff represented to Dr. Chin that he had fallen more than a dozen times, but that he did not want to use a walker.  (AR002287)  Dr. Chin noted that Plaintiff was unable to tolerate exam in the office because of complaints of back and leg pain.  (AR002287) Dr. Chin noted that during the examination, Plaintiff was walking slowly with some hesitancy on the left leg, but that he was able "to get on off exam table but leaning on hands for support." (AR002286)  Dr. Chin also prescribed Plaintiff a cane for stability. (AR002287)

54.     On May 10, 2012, Plaintiff informed Liberty that on May 7, 2012, he was admitted to Winchester Hospital and was currently in the intensive care unit due to internal bleeding. (AR000061)

55.     On May 11, 2012, Liberty received medical records from Hallmark Health Rehab Services, including an outpatient physical therapy evaluation dated April 24, 2012.  (AR000061, 2244-2256)  The physical therapist evaluating Plaintiff indicates that due to Plaintiff's report that he falls 4-5 times per day, he was "inappropriate for physical therapy at this time [secondary to] possible spinal cord involvement."  (AR000061, 2255)

56.     On May 16, 2012, Dr. Rathmell responded to Liberty's request for information by indicating that the MGH Pain Management Center "does not provide disability/work-related evaluations" and referred Liberty to Plaintiff's primary care physician for some assessment of his functional status. (AR002257)

57.     On May 17, 2012, Liberty notified Plaintiff that he was receiving long term disability benefits based upon his inability to perform the material and substantial duties of his occupation as

a Business Account Executive, but that to remain eligible for long term disability benefits beyond twelve months he must be disabled from "any occupation." (AR002234)  Liberty further indicated that the change in definition would occur on November 14, 2012. (Id.)

58.     On May 22, 2012, Liberty received a "Certification By Health Care Provider" completed by Dr. Chin dated May 17, 2012, indicating that Plaintiff was impaired by GI bleeding as well as chronic back pain and leg pain. (AR000060, 2223-26).  Liberty also received discharge instructions from Winchester Hospital dated May 14, 2012, and a letter from Winchester Hospital indicating that Plaintiff would be reevaluated by Dr. Chin on May 18, 2012 and that he should not participate in physical therapy. (AR002227-2231)

59.     On May 30, 2012, Liberty received additional medical information from MGH. (AR000060, 2165-2210)  A cardiology report dated January 19, 2012, indicated nonspecific ST segment and T wave abnormalities. (AR002166)  The discharge summary dated February 2, 2012, discussed Plaintiff's admission due to the staph infection at the site of his spinal cord stimulator. (AR002167-77) The records also included Plaintiff's laboratory reports from January 29, 2012 to February 2, 2012, AR002178-85, Dr. Rathmell's office visit notes dated December 20, 2011, February 17, 2012, March 13, 2012 and March 29, 2012, AR002186-96, and operative notes dated January 20, 2012, January 30, 2012 and March 20, 2012, AR002197-2204.  The information also included radiology reports dated January 29, 2012, February 1, 2012 and March 20, 2012. (AR002205-10)

60.     On June 5, 2012, Liberty received medical information from Dr. Chin.  The medical information indicated that Plaintiff had been admitted to Winchester Hospital on May 8, 2012 due to complaints of weakness, shortness of breath, dyspnea on exertion, black stools, and decreased hemoglobin and hematocrit. (AR000060, 2118-55)  Plaintiff was discharged on May 15, 2012 with a diagnosis of an acute GI bleed. (Id.)  He underwent a colonoscopy, which showed no signs of

bleeding and no abnormalities.  (Id.)  At the time of discharge, he had no further signs of bleeding.  (Id.)

61.     Dr. Chin's office visit note dated May 17, 2012 noted that since his discharge, Plaintiff has been feeling some generalized fatigue and dyspnea with exertion but feels fine doing everyday tasks.  (AR002119-20).  Dr. Chin noted Plaintiff had chronic low back pain, Plaintiff's report that the pain is worse since "being bed bound last week in hospital" and that Plaintiff was using his cane to walk.  (AR002119)  Dr. Chin also noted that Plaintiff had not been attending physical therapy because of his recent hospitalization.  (AR002120)

62.     The information provided by Dr. Chin also indicated that on May 22, 2012, Plaintiff underwent a follow-up with Dr. Nasima Khatoon. (AR002121-23)  Dr. Khatoon noted that Plaintiff indicated that his "current pain medication(s) are effective in the relief of pain." (AR002122)  Dr. Khatoon's note under "General Exam" indicates that Plaintiff was "[a]mbulatory and capable of all self care but unable to carry out any work activities. Up and about more than 50% of waking hours." (AR002122)  Dr. Khatoon also noted that Plaintiff had a "normal gait and station…[n]ormal range of motion…[s]trength and tone are normal."  (Id.)

63.     On or about June 5, 2012, Liberty contracted with Hub Enterprises, Inc. to conduct surveillance on Plaintiff. (AR0000060, 2117)  Per its report dated June 21, 2012, Hub Enterprises, Inc. conducted surveillance on June 14, 2012 and June 19, 2012, but did not observe Plaintiff during the course of its investigation. (AR002111-2116)

64.     On June 14, 2012, Plaintiff represented to Liberty that he had been admitted to the hospital on June 12, 2012 and discharged on June 14, 2012.  Plaintiff indicated there was a possibility of deep vein thrombosis ("DVT").  (AR000059)

65.     On June 27, 2012, Plaintiff represented that his pain had escalated and that Dr. Rathmell would be performing trigger point injections in the second week of July.  (AR000059)

66.     On July 17, 2012, Plaintiff informed Liberty that Dr. Chin would be referring him for a leg CT scan and that he had been seen by a cardiologist, Dr. Jagmeet Singh, on July 16, 2012. (AR000059)

67.     On July 31, 2012, Dr. Chin provided Liberty with a completed Restrictions Form dated July 27, 2012.  (AR00058, 2088).  Dr. Chin noted that Plaintiff had no occupational capability and stated that Plaintiff was "unable to sit/stand for prolonged periods [secondary to] pain." (AR002088) Liberty also received an imaging report from Dr. Chin's office of Plaintiff's cervical spine dated July 24, 2012.  The CT scan revealed degenerative changes at C6-7 and no spinal stenosis or neural forminal stenosis. (AR002094-95)  The CT scan was otherwise unremarkable and no fracture or misalignment was seen.  (AR002094)

68.     On August 7, 2012, Plaintiff informed Liberty that he had seen Dr. Rathmell earlier in the day because the generator for the spinal cord stimulator was pushing out of his skin. (AR000058)  Later that same day, he indicated that MGH had informed him that he had a blocked artery and would need a cardiac catheterization.  (AR000058)

69.     On August 17, 2012, Liberty received 134 pages of medical records from Dr. Chin dated between April 27, 2012 and July 24, 2012.  (AR000056, 1935-2069)  These records included Dr. Chin's office notes, diagnostic testing, discharge summaries, and notes from Plaintiff's hospitalization at Winchester Hospital.  (Id.)

70.     On August 22, 2012, Liberty received medical records from plaintiff's cardiologist, Dr. Singh.  (AR000056, 1890-1902)  The records included office visit notes dated July 16, 2012 and August 7, 2012, a diagnostic report regarding the results of stress test and electrocardiogram (EKG) dated August 7, 2012, a diagnostic report regarding the results of a cardiac catheterization dated August 9, 2012, and a Restrictions Form completed by Dr. Singh and dated August 15, 2012.  (Id.)

On the Restrictions Form, Dr. Singh indicated Plaintiff had no restrictions from a cardiac perspective. (AR001901)

71.     On August 29, 2012, Plaintiff informed Liberty that he was scheduled to have surgery on August 30, 2012 to have his spinal cord stimulator repositioned. (AR000056)

72.     On August 29, 2012, Liberty received 110 pages of medical records from Dr. Chin dated between April 27, 2012 and August 16, 2012. (AR000056, 1780-1889) These records included Dr. Chin's office notes, diagnostic testing, discharge summaries, and notes from Plaintiff's hospitalization at Winchester Hospital. (Id.)

73.     On or about the same time, Dr. Rathmell responded to Liberty's request that he complete a Restrictions Form, by again indicating that the MGH Pain Management Center "does not provide disability/work-related evaluations" and referred Liberty to Plaintiff's primary care physician for some assessment of his functional status. (AR001770) While Dr. Rathmell signed and dated the Restrictions Form on August 24, 2012, Dr. Rathmell did not answer any of the information requested regarding Plaintiff's capabilities and instead instructed Liberty to "Please obtain a formal capacity evaluation." (AR001776)

74.     On September 3, 2012, Liberty received medical records from MGH indicating that Plaintiff was observed in its Emergency Department on August 28, 2012 due to complaints of back pain. (AR000056, 1777-1779)

75.     On September 7, 2012, Liberty received medical records from MGH, consisting of Dr. Rathmell's office notes dated from June 27, 2012, July 31, 2012 and August 7, 2012. (AR000056, 1760-1766) The office note dated August 7, 2012 indicated that Plaintiff had been diagnosed with degenerative disc disease of the cervical spine and indicated that Plaintiff "is still getting good pain control and coverage from his spinal cord stimulator." (AR001761)

**The Social Security Administration Determines That Plaintiff Meets the Medical Requirements for Disability Benefits Under Applicable Law and Regulations**

76.     On August 9, 2012, Plaintiff faxed Liberty a letter dated July 30, 2012 from the United States Social Security Administration ("SSA").  (AR000057)   In that letter, the SSA indicated that Plaintiff met the medical requirements for disability benefits, based upon Social Security law and regulations. (AR002086-87)  While Plaintiff claimed to be disabled as of May 11, 2011, "because of Crohn's disease, anxiety, depression, rheumatoid arthritis, nerve damage, history of pulmonary embolism, [and] [R]eynauds disease," the SSA indicated that Plaintiff was not disabled until June 4, 2012. (Id.)   After Plaintiff appealed this determination and on October 20, 2012, the SSA awarded benefits to Plaintiff, effective November, 2011.  (AR000053, 1744-1746) Plaintiff notified Liberty the SSA's determination on October 24, 2012.  (AR00053)

**Liberty Reviews Plaintiff's Claim To Assess Whether Plaintiff Remained Disabled After The Twelve Month Period When The Definition of Disability Changes**

77.     On September 7, 2012, the disability case manager ("DCM") handling Plaintiff's claim requested a file review from Liberty's managed care department.  (AR000056) The disability claim manager noted that the change in definition of disability under the Policy would occur on November 14, 2012.  She requested information regarding Plaintiff's disabling condition and all comorbid conditions as well as the identification of any supported restrictions and limitations and their duration.    (Id.)    The disability claim manager indicated that "based upon multiple hospitalizations and severity of condition," she anticipated approval of Plaintiff's claim after the changed in definition. (Id.)  She also indicated that Plaintiff's claim for Social Security benefits had been approved. (Id.)

78.     Liberty conducted a review of Plaintiff's file on September 13, 2012.  (AR000055) After summarizing Plaintiff's physical condition, the reviewing nurse noted that Plaintiff "has several chronic conditions as well as a recent acute episode of GI bleeding.  Based on his lower

extremity CRPS and pain complaints, as well as the fact that he uses a cane for ambulation[,] restrictions on prolonged standing and walking are reasonable[.] However, physician reviews are indicated to determine [restrictions and limitations] beyond these." (AR000055)  The reviewing nurse noted that on the Restriction Form dated August 24, 2012, Dr. Rathmell had declined to impose restrictions and limitations and had instead recommended a functional capacity examination. (Id.)

79.    On September 13, 2012, Liberty referred Plaintiff's claim file for an independent review by Gregg G. Marella M.D., Board Certified in Internal Medicine and Ephraim K. Brenman, D.O., Board Certified in Physical Medicine and Rehabilitation and sub specialty certificate in Pain Medicine. (AR001716-1720, 1734-1743, 1753-1756)  These independent reviewing physicians were referred to Liberty by a third party vendor, MES Solutions ("MES"). (AR001753-1756)

80.    Dr. Marella issued a report dated October 5, 2012.  (AR001734-1738)  Based upon a thorough review of Plaintiff's records, Dr. Marella opined that Plaintiff's records supported diagnoses of DVT (deep vein thrombosis) and pulmonary embolism due to a factor V Leiden deficiency and contained evidence of cervical and lumbar disk disease, degenerative joint disease affecting the spine and tarsal tunnel syndrome, an iron deficiency and orthostatic hypotension.  He noted, however, that Plaintiff's records did not contain evidence to support Crohn's disease, POTS (postural orthostatic tachycardia syndrome), rheumatoid arthritis or GERD (gastro esophageal reflux disease). (AR001736-1737) While deferring pain-related issues to Dr. Brenman, Dr. Marella opined that Plaintiff did not have any limitations based upon the records reviewed and that Plaintiff had a sustained full-time sedentary work capacity. (AR0001737) He noted that there were no "residual effects" of Plaintiff's DVT or pulmonary embolism and no reason to recommend limitations on his other conditions. (Id.)  In his report, Dr. Marella certified, among other things, that he does "not accept compensation for any review activities that is dependent in any way on the specific outcome of the case." (AR001737)

17

81.     Dr. Brenman issued a separate report dated October 5, 2012. (AR001739-1743)  In his report and after a thorough review of Plaintiff's claim file, Dr. Brenman opined that Plaintiff's medical record supported diagnoses of CRPS, status post spinal cord stimulator implant, and unexplained persistent pain despite spinal cord stimulator implant with unexplained bilateral hand numbness, tingling and stiffness. (AR001741) Based upon these supported diagnoses and the medical records, Dr. Brenman opined that Plaintiff's restrictions consisted of no ladder climbing or walking on uneven surfaces or balancing, only occasional reaching below waist level, squatting and stair claiming, and standing and walking up to 4 hours a day total out of an 8-hour day, up to 30 minutes at a time, needing a 2 to 3 minute break to stop and stretch. (AR001742)  Based upon these restrictions, Dr. Brenman opined that Plaintiff had a sustained full-time sedentary capacity. (Id.) Dr. Brenman explained that Plaintiff had "ongoing symptoms, but…has mainly subjective complaints with a lack of objective findings to support [his] subjective complainants at this time. According to Dr. Chin's note, the [Plaintiff] has received modest improvement from the utilization of the medication regimen as well as the spinal cord stimulator implant."  (Id.)

82.     Dr. Brenman certified, among other things, that he does "not accept compensation for any review activities that is dependent in any way on the specific outcome of the case." (AR001742)

83.     Liberty also referred Plaintiff's claim to a Vocational Specialist, who conducted a vocational analysis of Plaintiff's capabilities, trainings, education, and experience based upon Dr. Marella and Dr. Brenman's assessment of Plaintiff's restrictions.  The Vocational Specialist opined that based upon Plaintiff's prior work history, educational background, life experience and Plaintiff's capacity based upon the restrictions provided by Dr. Marella and Dr. Brenman, Plaintiff could perform the occupations of a sales representative, a customer service representative, or an order clerk.  (AR001725-1728)

84.     After conducting a thorough review of Plaintiff's claim, including the assessments by Dr. Marella and Dr. Brenman, Liberty reasonably determined that Plaintiff did not meet the definition of "disabled" under the Policy. (AR0001719) Accordingly, Liberty discontinued Plaintiff's long term disability benefits beyond November 14, 2012 when the definition of "disability" changed. (AR001716) Liberty notified Plaintiff of its decision by letter dated November 9, 2012. (AR001716-20)

### Plaintiff Appeals Liberty's Decision Through Counsel

85.     By letters dated May 7 and May 8, 2013, Plaintiff through counsel appealed Liberty's decision. (AR001677-1695, 1710-1711)

86.     In the May 8, 2013 letter, Plaintiff contends that he is "occupationally impaired due to his physical conditions" and that he "lacks the ability to engage in a sedentary occupation." (AR001677) He claims that "primary reasons" he "cannot work in any occupation, or in gainful employment is that he suffers from severe rheumatoid arthritis, coagulation disorder, tarsal tunnel syndrome and other painful conditions known as Complex Regional Pain Syndrome ("CRPS") that severely limit his mobility." (Id.) He also contends that he is impaired by his prescribed medications. (AR001678)

87.     Plaintiff contends that his assertion is supported by the medical documentation enclosed with the letter, including a decision of the SSA and a Short Form Physical Capacities Evaluation and Medical Assessment Regarding Plaintiff completed by Plaintiff's treating physician, Dr. Chin. (Id.)

88.     In the residual functional evaluation dated April 11, 2013, Dr. Chin opined that Plaintiff was unable to return to work. She stated that on a "good day" Plaintiff was only able to sit for thirty (30) minutes at any one time and for three (3) hours in one day; only able to stand for ten (10) minutes at any one time and for ten (10) minutes in one day; and only able to walk with a cane for five (5) minutes at any one time and for fifteen (15) minutes in one day. (AR000239-246, 240)

When asked "[w]hat objective medical evidence supports each condition and each area of restriction, limitation, pain, and disability," Dr. Chin wrote "See extensive medical history." (AR000245)

89.     In support of Plaintiff's appeal, Plaintiff's counsel also submitted a CD-ROM containing more than 1400 pages of materials. (AR000238-001664)   The materials included statements from Plaintiff's friends and family members, a decision from the SSA, a set of documents that Plaintiff characterizes as his "complete SSA file," various medical records, numerous print-outs regarding medications from an internet site Drugs.com, academic publications, other non-medical information, and a complete copy of the claim file Plaintiff's attorney previously received from Liberty.  (Id.)  A list of the enclosed documents appears in the May 8, 2013 letter. (AR0001678)

## Liberty's Review of Plaintiff's Claim on Appeal

90.     Upon receiving Plaintiff's request for an appeal, Liberty transferred Plaintiff's claim to its Appeals Unit.  (AR000051, 1666)

91.     As part of its review of Plaintiff's appeal, Liberty's Appeals Unit referred his claim file for independent medical peer review to Harold E. Gottlieb, M.D., Board Certified Internal Medicine, and Jamie L. Lewis, M.D., Board Certified Physical Medicine & Rehabilitation/Pain Medicine and Physical Medicine & Rehabilitation. (AR000095-113, 146-165) These independent reviewing physicians were referred by MCMC LLC. (AR000231-236)

92.     Dr. Lewis reviewed Plaintiff's voluminous claim file and provided a report dated July 30, 2013. (AR000146-165) Based upon his review of Plaintiff's claim file, Dr. Lewis indicated that Plaintiff's supported diagnoses consisted of (1) being status post tarsal tunnel release surgery in June of 2011, resulting in CRPS, (2) being status post spinal cord stimulator implantation surgery, (3) chronic back pain, and (4) degenerative disc disease of the cervical spine. (AR000163)

93.     Dr. Lewis opined that beyond November 14, 2012, Plaintiff would have sustained capacity for full time work, provided he had some restrictions regarding lifting, walking, and standing, but none regarding sitting. (AR000163-164)

94.     Dr. Lewis noted that while Plaintiff's healthcare provider reported that Plaintiff was unable to work, "there are no current objective/clinical findings that would restrict [Plaintiff] from working full time with the above restrictions and limitations." (AR000164) Dr. Lewis also opined that, "[b]ased on the provided documentation, there are no physical or cognitive examination findings of any functional impairment suggesting that [Plaintiff's] ability to work has been directly impacted by adverse medication side effects."  (Id.)  Dr. Lewis certified, among other things, that his compensation for "performing the subject review is not dependent, in any way on the outcome of this case." (AR000164)

95.     On July 30, 2013, Dr. Gottlieb also issued a report after reviewing Plaintiff's claim file and speaking with Plaintiff's attending physician, Dr. Chin. (AR000095-113) Dr. Gottlieb opined that Plaintiff had the sustained capacity for full time work without restrictions or limitations. (AR000108-109)   Dr. Gottlieb opined that there were no restrictions from Factor V Leiden deficiency and no evidence of cardiac or pulmonary disease, Crohn's disease, or Rheumatoid Arthritis or physical examinations that show weakness of any of the extremities or changes suggestive of Rheumatoid Arthritis.  (AR000108-109).  Dr. Gottlieb opined that according to cardiology, Plaintiff's symptoms of POTS are under "good control."  (AR000109)

96.     While Dr. Gottlieb deferred to the appropriate specialist regarding Plaintiff's CRPS, associated pain, and degenerative joint disease, he noted that his conversation with Dr. Chin confirmed his

> opinion that most of [Plaintiff's] complaints are self reported [sic] and not substantiated by physical examination. There has been no demonstration of muscle weakness and no observed falls. From Dr. Chin's description, [Plaintiff] all of a sudden feels weak and falls down. Dr. Chin admits that [Plaintiff] is always able to get to her

office and walk in without much difficulty. The medical records support that [Plaintiff] has a sustained capacity for full time work without restrictions and limitations.

(AR000109)

97.     Dr. Gottlieb also opined that "[t]here is no medical evidence that support that [Plaintiff] experienced any side effects from the prescribed medications." (AR000109)

98.     On August 12, 2013 and after Dr. Chin appended a brief statement to Dr. Gottlieb's synopsis of their prior discussion, Dr. Gottlieb provided an addendum to his July 30, 2013 report. After reviewing the additional information provided by Dr. Chin—which consisted of a recapitulation of the information provided during their prior telephone call and a clarification of when Plaintiff's diagnosis of Crohn's disease was made—Dr. Gottlieb opined that no new information was present and that the additional information did not change his prior opinion. (AR000113) Dr. Gottlieb also certified, among other things, that his compensation for "performing the subject review is not dependent, in any way on the outcome of this case." (AR000109-110)

99.     Liberty again referred Plaintiff's file to a Vocational Case Manager for an updated transferable skills analysis. (AR000050)   The analysis showed that Plaintiff was able to perform the occupations previously identified. (Id.)

100.    By letter dated August 12, 2013 and based on its review of Plaintiff's claim file, Liberty upheld its original decision to discontinue benefits beyond November 14, 2012. (AR000088-94)

101.    Liberty explained that because Plaintiff's long term disability benefits began on November 15, 2011, the change in definition of disability occurred on November 14, 2012. Accordingly, in order for Plaintiff to receive long term disability benefits beyond November 14, 2012, he must be disabled from any occupation and not just his own occupation.  (AR000089) Liberty identified the relevant language in the Policy.  (AR000089-90) Liberty discussed the

opinions of Dr. Lewis and Dr. Gottlieb and the results of the transferrable skills analysis. (AR000090-93).

102.     While acknowledging the SSA's determination, Liberty explained that the SSA afforded special deference to Plaintiff's treating physicians over non-treating physicians and that this special deference is not applicable under ERISA benefit cases.  Liberty also indicated that the SSA's decision is based upon different and updated medical information not considered by the SSA. (AR000093)

103.     Liberty noted that it had conducted a full and fair review of Plaintiff's appeal and accompanying materials, and that it determined that the denial of benefits would be maintained. (AR000094) It then advised Plaintiff of his rights under ERISA, including the right to bring a civil action.  (Id.)

<div style="margin-left:40%">

Respectfully submitted,

LIBERTY LIFE ASSURANCE COMPANY OF
BOSTON and COMCAST COMPREHENSIVE
HEALTH AND WELFARE BENEFIT PLAN,

By their attorneys,

/s/ Andrew C. Pickett
Andrew C. Pickett (BBO#549872)
Kevin M. Sibbernsen (BBO# 675654)
JACKSON LEWIS P.C.
75 Park Plaza
Boston, MA 02116
(617) 367-0025; FAX: (617) 367-2155
PickettA@JacksonLewis.com
SibbernK@JacksonLewis.com

</div>

Dated: January 30, 2015

### CERTIFICATE OF SERVICE

This hereby certifies that on this 30th day of January 2015, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ *Andrew C. Pickett*
Jackson Lewis P.C.