UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BRUCE TRACIA,
    Plaintiff

V.

LIBERTY LIFE ASSURANCE
COMPANY OF BOSTON,
and
COMCAST CORPORATION LONG
TERM DISABILITY PLAN

NO. 13-13248-JDG

# PLAINTIFF'S RULE 56.1 STATEMENT

NOW COMES the plaintiff, Bruce Tracia ("Tracia") and files this Rule 56.1 statement.

**A. Liberty Determined That Tracia Was Totally Disabled Beginning May 10, 2011.**

1. Tracia left work on May 9, 2011 and never returned, due to severely and obviously impairing medical conditions. (AR 83).

2. By letter dated November 29, 2011 Liberty Life Assurance Company of Boston ("Liberty") approved Tracia for long-term-disability benefits ("LTD Benefits") having determined that he met the medical and vocational requirements set-forth in the COMCAST CORPORATION LONG TERM DISABILITY PLAN ("LTD Plan.") (AR879-80).

3. Before doing so, Liberty sought an opinion from a non-examining file reviewing physician, Stuart Lobel, MD who wrote

   RECOMMENDATION:
   1.    The claimant has a diagnosis of left leg CRPS following tarsal tunnel surgery and the failure to respond to conservative care. The diagnosis of CRPS can allow for pain of such a severity that it can limit work entirely, and is well

supported in the medical evidence provided for this claimant at this time. **The duration of the condition and its restrictions is life-long.** (emphasis added).

2.  The claimant has impairments of an impaired gait, impaired sensation, and CRPS related to pain. The restrictions and limitations are no work until the condition is treated as noted in the rationale. The diagnosis has been present for only the past few months, and the course of this disease process is variable, therefore the duration of restrictions is not clear at this point.

3.  The medical evidence provided supports a diagnosis of complex regional pain syndrome (CRPS).

4.  Conversation was not possible with the treating provider. However, based on a review of the medical evidence provided, I am in concordance with the documented medical assessment and recommendations.

4. There is no additional medical information that is required at this time. (AR 2358-59)

    **B.  Tracia Met The Definition of Disability Under the LTD Plan.**

5. Tracia met the definition of **Disabled** under the LTD Plan.

    **"Disability"** or **"Disabled",** with respect to Long Term Disability, means:
    a.    i.    if the Covered Person is eligible for the 12 Month Own Occupation benefit, **"Disability"** or **"Disabled"** means that during the Elimination Period and the next 12 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his **Own Occupation**; and thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of **Any Occupation**. (AR 9).


    "**Any Occupation**," with respect to Class 4, means any gainful occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity. Gainful occupation means an occupation in which the earnings are:
    -equal to or greater than 80% of the Employee's pre-disability income;
    - less than 80% of the Employee's average pre-disability income, but higher than the average earnings for the geographic area in which the Employee resides; or
    -equal to or greater than the gross benefit. (AR 7).

    "**Own Occupation**" means the Covered Person's occupation that he was performing when his Disability or Partial Disability began. If the Covered Person is unable to earn 80% of his pre-disability earnings, he will be considered unable to perform his Own Occupation. For the purposes of determining Disability under this policy, Liberty will

consider the Covered Person's occupation as it is normally performed in the national economy. (AR 12).

6. The LTD Plan is fully insured whereby Liberty pays benefits from its assets rather than those of the employer or a trust. (AR 1).

7. Liberty began paying to Tracia long-term-disability benefits ("LTD Benefits") in the amount of $3552.49 (AR 2344).

8. For purposes of LTD Benefits calculations, Tracia had pre-disability earnings in the amount of $5,920.82 per month. (AR 1725).

9. Liberty identified a change in definition date from "own occupation" to "any occupation" effective as of November 14, 2012. (AR 89).

10. By letter dated November 9, 2012, Liberty terminated Tracia's LTD Benefits contending that he was no longer Totally Disabled despite the determination of the Social Security Administration that had awarded benefits to Tracia under the Social Security Disability Income program, and Tracia's treating physicians who had determined that Tracia's medical conditions had not improved. (AR 247).

11. By letter dated May 8, 2013 Tracia appealed the adverse-benefits-decision with substantial medical documentation and other supporting materials on a CD-ROM (AR 1668-1711).

12. By letter dated August 12, 2013, Liberty upheld its prior termination dated November 9, 2012. (AR 88-94).

   **C. Tracia Achieved Great Occupational Success With Only A High School Education.**

13. Comcast Corporation ("Comcast") employed Tracia as an account executive. (AR 83; 447).

14. Tracia's education ended at high school in 1980. (AR 447).

15. Tracia had worked for Comcast since April 1993 in various roles starting as a line technician and eventually moving into sales and earning a solid salary. (AR 447).

16. As part of his compensation package, Comcast provided to Tracia benefits under the Comcast Corporation Long Term Disability Plan ("LTD Plan"). (AR 1).

17. Liberty identified Tracia as a Class 4 employee under the LTD Plan. (AR 89).

### D. Chronic Regional Pain Syndrome And Other Serious Medical Conditions Disabled Tracia in 2011 to the current time.

18. Liberty's claim manual instructs its employees, "However, it is important to remember that the claimant's attending physician should be the first source of medical information." (AR 238).

19. Tracia suffers from Chronic Regional Pain Syndrome ("CRPS") after tarsal tunnel surgery, ankle allodynia, rheumatoid arthritis, permanent nerve damage left leg and foot, lower back (nerve) pain, history of pulmonary embolism, side-effects of medications, degenerative disc disease, degenerative joint disease, bulging discs, and other ailments that collectively preclude him from working in any occupation. (AR 446; 647; AR 596-97; 2501).

20. On May 3, 2011, a medical note recorded

    Bruce presents today with a 3 week history of increasing pain burning and swelling along the medal aspect of the left ankle. It has progressed now where he Is getting sharp shooting discomfort both proximally and distally down the medial aspect of the ankle

4

into the heel. It is causing him difficulty with normal stinting and walking. He has tried icing at home with little to no relief. (AR 585)

21. On June 3, 2011 Tracia underwent a left foot tarsal tunnel release that did not relieve his pain. (AR 595).

22. A July 25, 2011 film disclosed

> IMPRESSION:    1. MILD-TO-MODERATE DEGENERATIVE LUMBAR SPONDYLOSIS AS DESCRIBED ABOVE.
>
> 2. APPARENT MICROLAMINECTOMY CHANGES ON THE LEFT AT THE L3-4 AND L4-5 LEVELS WITH SOME ENHANCING FIBROVASCULAR SCAR ALONG THE LEFT ASPECT OF THE THECAL SAC AT BOTH SITES.
>
> 3. MILD ANNULAR DISC BULGE ECCENTRIC TO THE LEFT AT L4-5 WHICH TOUCHES, BUT DOES NOT DISPLACE THE DESCENDING L5 NERVE ROOTS WITHIN THE LATERAL RECESS. COMPARISON WITH ANY PRIOR OUTSIDE STUDIES WOULD BE HELPFUL TO ACCESS FOR INTERVAL CHANGE. (AR 2501).

23. In August 2011, Tracia began treating with German Levin, MD of New England Spine Care Associates where he recorded in a medical note

> General examination:
> Patient is awake, alert and oriented x3 in no acute distress. He was able to ambulate with antalgic gait limping on the left side. Patient had difficulties ambulating on heel and toes on the left side secondary to pain. Low back examination revealed tenderness to palpation over bilateral lower lumbar paraspinal muscles as well as worsening of pain in left lower back and left posterior thigh with extension. Deep tendon reflexes 2+ bilateral knees and difficult to assess in left ankle secondary to pain. Patient has allodynia and hyperesthesia as well as skin discoloration and left distal lower extremity. Sensory exam is difficult to perform secondary to hypersensitivity. Muscle strength is also difficult to assess in left distal leg secondary to severe discomfort. (AR 643).

24. In August 2011, Tracia began treating with Seyed A. Mostoufi, MD, of New England Spine Care Associates where he underwent a series of injections for a lumbar sympathetic block. (AR 647-49).

25. Dr. Mostoufi recorded in his medical notes

He has complex regional pain syndrome status post tarsal tunnel syndrome surgery in June 2011. It is involving left ankle and foot. He has residual numbness in his in her foot postoperatively. He has allodynia top of the foot around his ankle and at the Achilles tendon area. He is here for a sympathetic chain block in the lumbar spine. (AR 647).

26. On September 13, 2011, Dr. Levin recorded in his medical notes, "He was unable to tolerate gabapentin secondary to side effects." (AR 638).

27. Tracia treated at the Massachusetts General Center for Pain Medicine. James P. Rathmell, MD documented that Tracia's Surgical history included: tarsal tunnel release; L4 disk surgery; gastric bypass surgery; cholecystectomy; Lysis Of Adhesions surgery;, hernia umbilical surgery; left tarsal tunnel release in 2011; spinal cord stimulator implant in 2012, removal and reimplantation in 2012. (AR 596-97).

28. On November 22, 2011, Dr. Rathmell recorded in his medical notes, "The narcotics have not been particularly helpful has tried PT but this was ineffective and painful. Neurontin gave pt hallucinations. Pt her today for potential SCS trial. (AR 596).

29. On January 30, 2012, Christopher Gilligan, MD uninstalled a spinal cord stimulator in Tracia after he developed a staph infection. (AR 588).

30. The stimulator had first been implanted on January 20, 2012. (AR 1095).

31. On April 19, 2012, Emily Chin, MD recorded in a medical note left knee pain, tenderness medial, leg pains, back pain, only minor improvement with stimulator, fell a dozen times (AR 1244).

32. On August 2, 2012, Dr. Rathwell recorded a medical note, "Pt last seen in MGH Pain Center on 7/31/2101. At the time he complained of left upper extremity pain that is burning in nature….He returns for scheduled interlaminar ESI at C7/T1…." (AR 1165).

33. Imaging on July 25, 2012 disclosed "moderate degenerative changes at C6-7." (AR 1168).

34. On July 27, 2012, Dr. Rathmell recorded a medical note that Tracia had been taking 5-6 10 mg tablets oxycodone providing only "moderate pain relief." (AR 1169).

35. On August 9, 2012, a medical note by James A. Scott, MD at MGH recorded, Shortness of breath, chest pains, history of CAD, unable to reach 85% max heart rate for age results in treatment in cardiac catherization laboratory at MGH on August 9, 2012 (AR 1208-13).

36. On August 17, 2012 a medical chart note of the Massachusetts General Hospital Center for Pain Medicine recorded:

    There is moderate advanced degenerative changes at C6-7.
    IMPRESSION: This is a 50-year-old with axial LBP and left lower extremity neuropathic pain status post spinal cord stimulator. There is clearly a myofascial component to his axial low back pain which may be addressed with PTs, topical lidocaine and potentially trigger point injections. His neuropathic symptoms have remained unchanged. He has had interval developments of neck pain, but there is no evidence of nerve root impingement at any level. (AR 1519).

37. On May 17, 2012, Dr. Chin recorded a medical note BACK PAIN CHRONIC. (AR 1291).

38. On April 18, 2012, Dr. Rathmell certified that Tracia could not sit, stand or walk for prolonged periods of time. (AR 1104).

39. On May 21, 2012 Tracia provided a detailed report of limited activities. (AR1139-1141).

40. As of April 4, 2013, Dr. Chin recorded that Tracia took at least 11 medications that cause cognitive impairment. (AR 242).

41. On April 30, 2012, Dr. Chin completed a detailed Liberty form determining that Tracia could not work in any occupation and had significant restrictions and limitation. (AR 1149).

42. On July 27, 2012, Dr. Chin completed a detailed Liberty form determining that Tracia could not work in any occupation and had significant restrictions and limitation. (AR 1149).

43. On April 11, 2013 Dr. Chin provided a detailed determination, answering no less than 41 questions, documenting activities, including (sitting, standing, walking, reaching, amount of weight lifting etc.) that she determined Tracia could not participate in due to his medical conditions, or could participate in for limited periods of time. (AR 239-246).

44. On April 11, 2013, Dr. Chin determined Traicia's tolerance for sitting, on the best of days, was limited to 30 minutes at one time, and no more than 3 hours on the best day, and much less on bad days. (AR 239).

45. On April 11, 2013, Dr. Chin determined that Tracia had to sleep 2 to 4 hours per day in the morning each day, and the same amount each afternoon. (AR 241).

46. On August 8, 2013, Dr. Chin faxed wrote to a Liberty retained file reviewing physician, Harold Gottlieb, MD who Liberty had retained through one of its usual vendors. (AR 141-142)

47. Dr. Chin wrote

    Crohn's was diagnose in teens, treated and in remission until 2004. He has had colonoscopy confirm Crohns with biopsies in the past. Continues on methotrexate/remicade intermittently. Recently had CG diagnosed ? appendicitis vs. Crohn's flare and underwent appendectomy. He also has Crohn's related iritis.

> Pt. has chronic back and leg pains and weakness in the legs. He has fallen multiple times because of the weakness and needs the cane for support all the time. He is always seen leaning on the cane for support and walks with a noticeable limp. Has had multiple injections, underwent spinal cord stimulator which has helped mildly but he remains on oral pain meds daily and follows closely with a pain management team.
>
> He has DSDNA elevation, ke ?? pneumonia per rheumatology. (AR 143).

48. Tracia's written representation of his limitations to the SSA on May 20, 2012 is consistent with Dr. Chin's determinations in 2013. (AR 602-09)

49. Dr. Chin recorded that Tracia used a cane to walk. (AR 240).

50. Dr. Chin determined that Tracia's ability to use a computer was 1 hour on the best of days. (AR 240).

51. Dr. Chin identified 11 medications taken by Tracia that caused cognitive impairment. (AR 2432).

52. Dr. Chin determined that the following cognitive activities were all SEVERELY impacted by pain.

> 26.    Does Patient Have Cognitive Defects Resulting From Pain, Pain Medication, Or Other Condition (Either Chronic Or Arising Upon Performing The Task) Sufficient To Interfere With His Ability To Do Professional, Managerial Or Even Clerical Tasks On A "Regular And Sustained Basis"?  What Is The Extent Of Such Defects?   For Purposes Of This Question:
>
> MODERATE Means An Impairment Of Slight Importance Which Affects, But Does Not Preclude, Ability To Function Or Perform The Task.
> MODERATELY SEVERE Means An Impairment Which Seriously And Significantly Interferes With The Ability To Perform Basic Work Activities Independently, Appropriately, And Effectively.
> SEVERE Means An Extreme Impairment Of Ability To Function.

| | None | Moderate | Moderately Severe | Severe |
|---|---|---|---|---|
| A. Analysis | _____ | _____ | _____ | __x__ |
| B. Concentration | _____ | _____ | _____ | __x__ |
| C. Sustained Attention. | _____ | _____ | _____ | __x__ |
| D. Short Term Recall | _____ | _____ | _____ | __x__ |
| E. Long Term Recall | _____ | _____ | _____ | __x__ |
| F. Communicate With Others. | _____ | _____ | _____ | __x__ |
| G. Interact With Others | _____ | _____ | _____ | __x__ |
| H. Follow Instructions | _____ | _____ | _____ | __x__ |
| I. Manage, Organize & Perform Multiple Tasks | _____ | _____ | _____ | __x__ |

```
J. Manage, Coordinate, &
   Oversee Tasks Being
   Performed By Others    _____ _____ _____     _____x__
K. Complete Tasks Timely  _____ _____ _____     _____x__
L. Consistent Professional
   Quality                _____ _____ _____     _____x__
M. Cope With Stress       _____ _____ _____     _____x__ (AR 244)
```

53. Dr. Chin determined Tracia's severe limitations were due to:

27   Do The Cognitive Defects Mentioned Above Result From:

   A. __x__ Chronic Pain
   B. __x__ Increased Pain
            With Activity
            Fatigue, or Stress
   C. __x__ Pain Medication and Side Effects
   D. __x__ Other Medication and Side Effects
   E. ____ Lack of Sleep From Pain or other Conditions
   F. ____ Other
   G. __x_ All of the Above
   H. ____ None of the Above
   I. ____ Following Combination (AR 244-45).

54. Dr. Chin determined, in response to the detailed questionnaire that Tracia could not fulfill the duties of either a sedentary occupation of light duty occupation.

55. Can Patient Perform A "Sedentary" Occupation under the DOT definition set forth above?

   YES _____        NO ___x___

56. Can Patient Perform A "Light" Occupation under the DOT definition set forth above?

   YES _____        NO ___x___ (AR 245).

57. Dr. Chin determined that Tracia was not lying about his conditions, exaggerating about his reports of pain, and Dr. Chin specifically disagreed with the grounds that Liberty determined that Tracia was not impaired from working as set forth in a letter dated November 9, 2012. (AR 245-251).

58. Dr. Chin's determination is consistent with

   The use of a straight cane to ambulate would limit a person to one-handed activities while the cane is in use. Assistive devices that require more upper/lower

extremity activity, such as crutches, walkers, wheelchairs, etc., would limit functional use of those extremities for work activities. Likewise, implantable devices, such as a spinal cord stimulator, peripheral nerve stimulator, or infusion system, may restrict the performance of job demands that involve repetitive bending, stooping, twisting, or rotating. The effects of exposure to repetitive whole-body vibration may have a detrimental effect on electrode/catheter position and/or tissue injury. The cognitive effects of medications, including reduced attention/concentration, task persistence, and/or stamina, could also erode one's functional capacity to work. *See* AADEP Paper. (AR 262).

### E. The Medical Profession And the Social Security Administration Recognized that Chronic Regional Pain Syndrome Is Occupationally Impairing.

59. "The impact of CRPS on whole person function (i.e., cognitive/emotional, social, leisure/recreational, and vocational as well as physical capacities) must be determined in order to establish the extent of disability. Only when the relationships among self-report of pain, functional capacity assessment results, objective findings from a physician's examination, and overt, verifiable indicators of life function (such as ability to work, interaction with others socially, involvement in recreational and leisure activities, etc.) are clearly established will the extent of disability be known." *See* AADEP Paper. (AR 256). (AR 257).

60. The Social Security Administration reports, "RSDS/CRPS is a chronic pain syndrome most often resulting from trauma to a single extremity. It can also result from diseases, surgery, or injury affecting other parts of the body. Even a minor injury can trigger RSDS/CRPS. The most common acute clinical manifestations include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma." (AR 262).

11

61. "Maximum medical improvement (MMI) is defined by the AMA *Guides to the Evaluation of Permanent Impairment* as a 'condition or state that is well stabilized and unlikely to change substantially in the next year, with or without medical treatment'." *See* **American Academy of Disability Evaluating Physicians (AADEP) Position Paper: Complex Regional Pain Syndrome I (RSD): Impairment and Disability Issues**, *Pain Medicine*, Volume 3, Number 3 (2002) at p. 278 ("AADEP Paper"). (AR 256).

62. "It is this committee's belief that if the individual being evaluated for possible CRPS has failed to progress in return of function after an adequate functional restoration and rehabilitation effort, including adequate medical evaluation, pharmacotherapy, and when medically indicated, psychiatric/ psychological treatment, and where appropriate, use of regional anesthetic and/or neuromodulatory procedures, that individual is likely to be at MMI." *See* AADEP Paper. (AR 256).

### F. All Pain Is Self-Reported And All Examining Physicians and Psychologists Determined That Tracia Was Credible.

63. According to the American Medical Association, *Guides to the Evaluation of Permanent Impairment*, 5th Edition, Chapter 18, *Pain*

    Pain is a plural concept with biological, psychological, and social components. Its perception is influenced by cognitive, behavioral, environmental, and cultural factors. At first glance, it seems at odds with scientific medicine because of the difficulty accounting for it with obvious pathophysiologic changes.

    **Pain is subjective. Its presence cannot be readily validated or objectively measured.** Physicians are confronted with ambiguity as they attempt to assess the severity and significance of chronic pain in their patients. In large part, this stems from the fundamental divide between a person who suffers from pain and an observer who attempts to understand that suffering. Observers tend to view pain complaints with suspicion and disbelief, akin to complaints of dizziness, fatigue,

and malaise. As Scarry remarked, "To have great pain is to have certainty, to hear that another person has pain is to have doubt:" (AR 278). (emphasis added).

64. Joanne Coyle, Ph.D, a psychologist retained by the Social Security Administration determined that Tracia's complaints of pain were credible. (AR 665).

SYMPTOMS AND CREDIBILITY
Can one or more of the individual's medically determinable impairments] (MDI(s)) reasonably be expected to produce the individual's pain or other symptoms?
Yes
Are the individual's statements about the intensity, persistence, and functionally limiting effects of the symptoms substantiated by the objective medical evidence alone?
Yes (AR 665).

65. Ronald Kulich, Ph.D. of the Massachusetts General Hospital Center for Pain Medicine determined that Tracia was credible

This pleasant gentleman describes a history of persistent extremity pain and is being considered for spinal column stimulation. He also remains on moderate dose chronic opioid therapy. He apparently does not oversomatisize and apparently does not exaggerate symptoms. While depressed, he does not meet criteria for a clear major depression, and no suicidal ideation, There was no indication of substance use disorder. He asserts adherence with opioid therapy, while there has been limited therapeutic effect.

He remains disabled, while there was no evidence of marked oversomatization. He appears legitimately impaired from work, as he does door to door sales. I would not expect a possible ADA accommodation. (AR 2380).

66. On April 15, 2013, in a sworn statement, Craig S. Pawelski, Tracia's brother-in-law, described how Tracia suffered from pain. (AR 304).

67. In April 2013, Tracia's wife described in a sworn statement his limitations and how Tracia's constant pain had impacted their life together. (AR 306-307).

68. On April 16, 2013, in a sworn statement, Marc Clermont, who had known Tracia for 15-years described his limitations. (AR 305).

69. On June 4, 2012 and June 9, 2012, Liberty retained HUB Enterprises to conduct surveillance of Tracia Surveillance over an approximate 12 hour period over 2 days, did not record Tracia engaged in any activities. (AR 1071).

**G. Liberty Ordered Tracia To Apply For Disability Benefits With the Social Security Administration Because Liberty Believed That Tracia's Impairing Medical Conditions Would Last More than 12 Months.**

70. Liberty required Tracia to apply for benefits with the Social Security Administration ("SSA") under the Social Security Disability Insurance ("SSDI") program given that Dr. Lobel had concluded that Tracia's was life-long. (AR 2363).

71. Tracia complied with Liberty's demand. (AR 2108).

72. By letter dated July 19, 2012, Liberty advised Tracia that if he failed to apply for benefits with the SSA, Liberty would automatically reduce his monthly LTD benefits by the sum of $1853 per month. Liberty wrote

   As discussed, you filed for Social Security Disability benefits approximately three (3) months ago. Please provide a copy of the receipt of application that you receive from Social Security.

   It is important that you provide this information no later than 30 days, otherwise, we will reduce your long-term disability benefit by the amount you may be eligible to receive from Social Security. We estimate that you would receive $185100 in Social Security Disability benefits. This estimate was determined by utilizing the benefit calculator provided by the Social Security Administration and is based on your most recent annual salary. If you fail to provide proof of filing as requested, your benefit from Liberty will be reduced from $3552.49 to $1699.49. (AR 2108)

73. The Social Security Administration made its determination based on much of the same records that had been in Liberty's possession and based on the opinion of Robert E. McGann, M.D. (AR 664-671).

74. Liberty's internal claim records document that by October 24, 2012, Liberty knew that the Social Security Administration had awarded benefits to Tracia finding him unable to engage in gainful employment (AR 53).

75. On October 31, 2012, Liberty reduced Tracia's monthly LTD Benefits payment from $3552.49 to $1526.49 based on the SSDI payment and demanded that Tracia pay to Liberty $22,282.93 for a so-called overpayment. (AR 1721).

### H. Liberty Terminated LTD Benefits Based On A Number of Reports From Non-Examining Physicians And A Flawed Vocational Report.

76. MCMC, a vendor that regularly works for Liberty, billed Liberty approximately $2200.00, and the amount paid to Dr. Gottlieb is unknown. (AR 85-87).

77. Prior to August 12, 2013, MCMC secured the services of Dr. Gottlieb, MD, an internal medicine physician, who authored an undated report of 19 pages without ever examining Tracia. (AR 95-113).

78. Dr. Gottlieb did not examine Tracia. (AR 98-107).

79. Dr. Gottlieb listed medical records and other data running 9 single spaced pages in his 19 page report, however, Dr. Gottlieb never stated that he reviewed the documents and data. (AR 98-107).

80. Dr. Gottlieb recorded in his report

> The claimant is a 51 year old male with a history of Tarsal Tunnel Syndrome, s/p tarsal tunnel decompression on 06/03/2011, Crohn's disease, Rheumatoid Arthritis, POTS, episcleritis, DVT, Factor V Leiden deficiency, questionable pulmonary embolism, PTSD, CRPS, obesity, and depression. (AR 107).

> The claimant has CRPS and associated pain. He also has chronic back and neck pain from Degenerative Joint Disease (DJD). However, I will defer comment on function related to CRPS and DJD to the appropriate specialist. (AR 109).

81. Dr. Gottlieb falsely concluded, "Beyond 11/14/2012, the claimant has the sustained capacity for full time work without restrictions or limitations." (AR 108).

82. Dr. Gottlieb falsely recorded in his report, "There is no the medical evidence that support that the claimant experienced any side effects from the prescribed medications." (AR 109).

83. Dr. Gottlieb did not speak with a treating physician other than Dr. Chin. (AR 98-107).

84. Dr. Gottlieb recorded in his report

    After speaking with Dr. Chin, it confirms my opinion that most of the claimant's complaints are self-reported and not substantiated by physical examination. There has been no demonstration of muscle weakness and no observed falls. From Dr. Chin's description, the claimant all of a sudden feels weak and falls down. Dr. Chin admits that the claimant is always able to get to her office and walk in without much difficulty. The medical records support that the claimant has the sustained capacity for full time work without restrictions and limitations. (AR 109).

85. Dr. Gottlieb filed an addendum discounting everything that Dr. Chin report writing

    The added information includes notes from Dr. Chin. The claimant's medical records were updated by Dr. Chin on 08/05/2013. This was a clinical list and past medical problems update. Details of the claimant's past medical history (PMH), surgical history, family history, are listed and updated. Clinical list changes and new observations are documented. I do not see any evidence that Dr. Chin actually saw the claimant on that day. (AR 113).

86. On July 3, 2013, MCMC secured the services of Jamie L. Lewis, MD, a physiatrist, who authored a report dated July 30, 2013 about Tracia. (AR 143-163).

16

87. Dr. Lewis did not examine Tracia. (AR 143-163).

88. Dr. Lewis did not state that he reviewed the nearly identical set of medical documents and data running 9 pages as listed on Dr. Gottlieb's report. (AR 153-162).

89. Dr. Lewis did not speak with any treating physicians. (AR 153-162).

90. Dr. Lewis falsely recorded in his report that Tracia could work full-time with the most minimal of restrictions. (AR 163-64).

On September 14, 2012, Liberty retained MES Solutions who in turn secured the services of Ephraim Brenman, MD, a physiatrist, who authored a report dated October 10, 2012, consisting of 5 pages. (AR 1081-85).

91. Dr. Brenman criticized all treatments and suggested that the treatments fell below the applicable standard of care. (AR 1084).

92. Dr. Brenman did not speak with a single treating physician.

93. Dr. Brenman falsely reported that Tracia had full-time sedentary capacity. (AR 1084).

94. On September 14, 2012, Liberty retained MES Solutions who in turn secured the services of Greg Marella, MD, an internist, who authored a report dated October 5, 2012, consisting of 5 pages.

95. Dr. Marella did not examine Tracia or speak with a single one of Tracia's physicians. (AR 1086-90).

96. Dr. Marella did not report that Tracia had been diagnosed with CRPS. (AR1088-89).

97. Dr. Marella falsely recorded that Tracia did not have any impairments, or limitations. (AR 1089).

98. A Liberty employee conducted a vocational review based only on the reports of Drs. Brenman and Marella and without considering any other medical records, or speaking with Mr. Tracia. (AR 1066-69).

99. The vocational reviewer recorded Tracia's pre-disability earnings in the monthly amount of $5920.82 and his gross LTD Benefit in the amount of $3552.49. (AR 1066)

100. The vocational reviewer incorrectly recorded that Tracia had worked as a sales representative for Comcast from 1994 – 2009. (AR 1067).

101. The vocational reviewer identified three occupations that Tracia could purportedly perform, Sales Representative, Customer Representative and Order Clerk. (AR 1068).

102. Only the occupation of Sales Representative reported monthly earnings in excess of Tracia's gross monthly LTD Benefit. (AR 1067).

          BRUCE TRACIA

          */s/Jonathan M. Feigenbaum*
          _____
          Jonathan M. Feigenbaum, Esq.
          B.B.O. No.546686
          184 High Street
          Suite 503
          Boston, MA 02110
          Tel. No. : (617) 357-9700
          jonathan@erisaattorneys.com

## CERTIFICATE OF SERVICE

I, hereby certify that this document and the exhibit filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic filing and paper copies will be sent to those indicated as non-registered participants on the date adjacent to my signature.

*/s/ Jonathan M. Feigenbaum, January 30, 2015*

                                                                   /s/ Jonathan M. Feigenbaum
                                                                   Jonathan M. Feigenbaum