UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | | |
|---|---|---|---|
| BRUCE TRACIA, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| v. | ) | CIVIL ACTION | |
| | ) | NO. 13-13248-JGD | |
| LIBERTY LIFE ASSURANCE | ) | | |
| COMPANY OF BOSTON and | ) | | |
| COMCAST CORPORATION LONG | ) | | |
| TERM DISABILITY PLAN, | ) | | |
| | ) | | |
| Defendants. | ) | | |

**AMENDED MEMORANDUM OF DECISION AND ORDER
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT[1]**

February 10, 2016

DEIN, U.S.M.J.

**I.  INTRODUCTION**

The plaintiff, Bruce Tracia ("Tracia"), was employed as a business account executive at

Comcast Cable Communication Management, LLC ("Comcast").  On May 10, 2011, he stopped

working due to ankle related pain, for which he subsequently underwent surgery.  Tracia was

later diagnosed with chronic regional pain syndrome and degenerative disc disease, among

other medical conditions.  On December 23, 2013, Tracia brought this action, pursuant to the

Employee Retirement Income Security Act, 29 U.S.C. §§ 1132 et seq. ("ERISA"), to recover long-

term disability ("LTD") benefits under the terms of an LTD benefits policy that was issued and

administered by the defendant, Liberty Life Assurance Company of Boston ("Liberty").  Under

---

[1]  This decision has been amended for publication.

the relevant provisions of the policy, an employee is considered disabled if, for the first 12 months, the employee is "unable to perform the Material and Substantial Duties of his Own Occupation" as a result of injury or sickness. Thereafter, an employee is only considered disabled if he "is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation." Although Liberty determined that Tracia was disabled and entitled to LTD benefits for the first 12 months, it concluded after the initial period that he no longer qualified as disabled under the terms of the policy. Accordingly, Liberty terminated his LTD benefits after November 14, 2012.

In connection with its decision to terminate Tracia's benefits, Liberty relied primarily on the opinions of third-party physicians who reviewed the medical records and other information contained in the plaintiff's claim file, and determined that there was no objective evidence showing that the plaintiff's impairments and associated pain precluded his ability to perform full-time sedentary work. Tracia asserts that Liberty acted improperly by requiring objective evidence to support his claim of disabling pain, and that its reliance on the opinions of the reviewing physicians was arbitrary and capricious. In addition, Tracia asserts that Liberty's decision to terminate his benefits was influenced by a conflict of interest arising from its dual role in making benefits determinations and paying claims. By his complaint, Tracia is seeking reinstatement of his LTD benefits retroactive to the date of termination (Count I), as well as an award of attorney's fees, costs and interest under ERISA (Count II).

The matter is presently before the court on the "Plaintiff's Motion for Judgment on All Counts in His Complaint" (Docket No. 28), and on the "Defendants' Motion for Summary Judgment" (Docket No. 29). By their motions, each of the parties is seeking summary judgment

in its favor on both Counts of Tracia's complaint.  At issue is whether Liberty's decision to terminate Tracia's LTD benefits on the grounds that Tracia could perform sedentary work and therefore was not disabled was reasonable and supported by substantial evidence.  As detailed below, this court finds that Liberty deprived Tracia of a full and fair review of his claim and that its decision to deny his request for benefits was unreasonable, but that the matter must be remanded to the defendant for further administrative proceedings.  Therefore, and for all the reasons described herein, the plaintiff's motion for summary judgment is ALLOWED IN PART and DENIED IN PART, and the defendants' cross-motion for summary judgment is DENIED.

## II.  <u>STATEMENT OF FACTS</u>[2]

### <u>The Long-Term Disability Policy</u>

Tracia began working as a line technician at Comcast in 1993.  (PF ¶ 15; DR ¶ 15).  He held various positions during the course of his employment, and was working as a Business Account Executive in sales at the time of the events giving rise to this action.  (PF ¶ 15; DF ¶ 9). As part of his employment with Comcast, Tracia was eligible for benefits under the terms of a Group Disability Income Policy ("Policy").  (PF ¶ 16; DR ¶ 16; AR 000001).  There is no dispute that the Policy constitutes an employee welfare benefit plan, which is governed by ERISA.  (DF ¶ 2).

Liberty is both the administrator of the Policy and the payer of any benefits awarded thereunder.  (<u>See</u> DF ¶ 3; PF ¶ 6; DR ¶ 6).   In order to qualify for LTD benefits, eligible

---

[2]  The facts are derived from the following materials: (1) the Agreed to Record for Judicial Review ("AR") (Docket No. 20); (2) the Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment ("DF") (Docket No. 31); (3) Plaintiff's Rule 56.1 Statement ("PF") (Docket No. 34); (4) the Defendants' Responses to Plaintiff's Rule 56.1 Statement ("DR") (Docket No. 37); and (5) the Plaintiff's Response to Defendants' Rule 56.1 Statement ("PR") (Docket No. 40).

employees are required to provide Liberty with "Proof of continued . . . Disability."  (DF ¶ 4).

Under the applicable provisions of the Policy, an employee is deemed to be "Disabled" or under

a "Disability" if, "during the Elimination Period[3] and the next 12 months[,]" the employee, "as a

result of Injury or Sickness, is unable to perform the Material and Substantial Duties[4] of his *Own*

*Occupation*[.]"  (DF ¶ 6 (emphasis added)).  After that time, an employee is considered to be

"Disabled" or under a "Disability" only if he "is unable to perform, with reasonable continuity,

the Material and Substantial Duties of *Any Occupation*."  (Id. (emphasis added)).  The Policy

defines the term "Own Occupation" to mean the occupation that the employee "was

performing when his Disability . . . began."  (AR 000012).  The term "Any Occupation" is defined

as:

> any gainful occupation that the [employee] is or becomes reasonably
> fitted by training, education, experience, age, physical and mental
> capacity.  Gainful occupation means an occupation in which earnings are:
> equal to or greater than 80% of the Employee's pre-disability income; less
> than 80% of the Employee's average pre-disability income, but higher
> than the average earnings for the geographic area in which the Employee
> resides; or equal to or greater than the gross benefit.

(DF ¶ 8).  The fundamental question in this case is whether Liberty abused its discretion when it

determined, after paying Tracia LTD benefits for an initial 12 month period, that the plaintiff

had the ability to perform the material and substantial duties of "Any Occupation," and no

longer qualified as Disabled within the meaning of the Policy.

---

[3]  The "Elimination Period" is defined to mean "a period of consecutive days of Disability or Partial Disability for which no benefit is payable."  (AR 000010).  The Elimination Period "begins on the first day of Disability."  (Id.).

[4]  The Policy defines the phrase "Material and Substantial Duties" to mean "responsibilities that are normally required to perform the [employee's] Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified."  (DF ¶ 7).

**Approval of Tracia's Claim for Short-Term Disability Benefits**

The circumstances leading up to the present dispute began in early May 2011.  At that time, Tracia sought medical treatment due to increasing pain, burning and swelling in his left ankle.  (PF ¶ 20).  The plaintiff's treating podiatrist, Dr. Drew Taft, diagnosed Tracia with tarsal tunnel syndrome, and on May 10, 2011, Tracia stopped working and submitted a claim for short term disability to Liberty.  (See DF ¶¶ 9-11).  On May 13, 2011, Liberty notified Tracia that it had approved his claim for short term benefits.  (Id. ¶ 11).  Accordingly, Tracia began receiving benefits on May 17, 2011.  (AR 002479).  It is undisputed that Tracia never returned to Comcast, and has remained out of work since May 10, 2011.

The record establishes that the plaintiff underwent tarsal tunnel release surgery on June 3, 2011.  (PF ¶ 21).  However, the surgery failed to relieve his symptoms.  Instead, following the surgery, Tracia developed increased pain on the upper part of his foot, and suffered a loss of sensation in his toes and heel.  (AR 000077).  An MRI performed on July 25, 2011 also revealed mild-to-moderate spondylosis and post-surgical changes in Tracia's lumbar spine, as well as a mild annular disc bulge at L4-5.  (PF ¶ 22).  In late July 2011, Dr. Taft referred Tracia to German Levin, M.D. at New England Spine Care Associates for treatment of pain in his left distal lower extremity, low back and left leg.  (DF ¶ 20; AR 000642).  Liberty continued to approve Tracia's claim for short term disability benefits during that time period.  (DF ¶ 22).

Dr. Levin began treating the plaintiff on or about August 2, 2011.  (See AR 000642).  In his progress notes, Dr. Levin noted that the plaintiff had a medical history of, among other things, back pain, rheumatoid arthritis and deep vein thrombosis ("DVT"), as well as a surgical history of, among other things, discectomy, and hernia repair.  (Id.).  Based on his own

examinations, Dr. Levin determined that Tracia's lower back pain was secondary to his mild lumbar spondylosis.  (See AR 000638, 000643).  He also diagnosed Tracia with "[l]eft lower extremity chronic regional pain syndrome" ("CRPS").  (AR 000640).  CRPS is "a chronic neurological syndrome characterized by severe pain."  Holmstrom v. Metro. Life Ins. Co., 615 F.3d 758, 762 (7th Cir. 2010).  Dr. Levin attempted to treat the plaintiff's pain with lumbar sympathetic blocks, medication and a referral to physical therapy.  (See DF ¶¶ 21, 25; AR 000638-40).  Throughout the course of that treatment, Liberty continued to monitor the plaintiff's medical condition and to approve his claim for short term disability benefits.  (DF ¶¶ 21-23, 25).

Dr. Levin's prescribed treatment proved ineffective at relieving Tracia's pain.  (AR 000638).  Accordingly, the plaintiff was referred to James P. Rathmell, M.D. at the Massachu-setts General Hospital ("MGH") Center for Pain Management for possible implantation of a spinal cord stimulator ("SCS").  (See DF ¶ 30; PF ¶¶ 27-28).  On October 26, 2011, Tracia informed Liberty that he would be receiving an SCS.  (DF ¶ 33).  Liberty agreed that it would continue to pay his claim for short term disability benefits through November 14, 2011.  (Id.).

### Approval of Tracia's Initial Claim for LTD Benefits

Because Tracia's right to receive short term disability benefits expired on November 14, 2011, Liberty agreed to consider his claim under Comcast's LTD Policy.  (AR 002479).  Accord-ingly, Liberty referred Tracia's claim file to Steven M. Lobel, M.D., an independent peer reviewer, for purposes of determining the diagnoses causing impairment, the restrictions and limitations supported by the medical evidence, and other information relevant to Tracia's claim for LTD benefits.  (DF ¶¶ 36, 39; AR 002375).  It also obtained medical records from Dr.

Rathmell's office, and information from Tracia's primary care physician, Emily Chin, M.D., which

it forwarded to Dr. Lobel.  (DF ¶¶ 35, 37-39).  On or about November 23, 2011, Dr. Lobel issued

a report describing the results of his review.  (Id. ¶ 40; AR 002356-60).  Therein, Dr. Lobel

opined in relevant part as follows:

> 1.   The claimant has a diagnosis of left leg CRPS following tarsal tunnel
> surgery and the failure to respond to conservative care.  The diagnosis of
> CRPS can allow for pain of such a severity that it can limit work entirely,
> and is well supported in the medical evidence provided for this claimant
> at this time.  The duration of the condition and its restrictions is life-long.
>
> 2.   The claimant has impairments of an impaired gait, impaired sense-
> tion, and CRPS related to pain.  The restrictions and limitations are no
> work until the condition is treated as noted in the rationale.  The diag-
> nosis has been present for only the past few months, and the course of
> this disease process is variable, therefore the duration of restrictions is
> not clear at this point.
>
> 3.   The medical evidence provided supports a diagnosis of complex
> regional pain syndrome (CRPS).

(AR 002358-59).  Although Dr. Lobel found that Tracia lacked the present ability to work, he

predicted that Tracia would have the ability to perform work in the future.  Thus, as Dr. Lobel

stated, "it would be reasonable to expect that a trial of SCS, and if successful, an implantation

of the device would resolve his symptoms and the permanent inability to perform any work,

and would allow for future gainful full-time employment to be supported."  (AR 002359).  He

further opined that Tracia would likely have the capacity to perform full-time sedentary work

following a ten week post-operative period of recovery.  (Id.).  The parties' dispute in this case

concerns whether Liberty's eventual conclusion that Tracia could carry out such work despite

his continuing complaints of pain was reasonable, or whether the defendant acted unlawfully

by terminating his claim for LTD benefits.

In a letter dated November 29, 2011, Liberty notified Tracia that based on the medical and vocational information in his file, it had determined that he was disabled within the meaning of the Policy, and was entitled to receive LTD benefits as of November 15, 2011.  (DF ¶ 44; AR 002362-63).  It also notified him that his claim "will be evaluated periodically to determine ongoing disability[,]" and that its approval of LTD benefits "does not guarantee payments through the maximum benefit duration."  (AR 002362).  In addition, Liberty informed Tracia that the Policy "requires that you apply for Social Security Benefits, should your disability be expected to extend for twelve months[,]" and that his LTD benefits would be reduced by the amount of any other income, including social security benefits.  (AR 002363).  Tracia subsequently filed an application for social security disability insurance benefits, claiming that he had been disabled since May 11, 2011 due to, among other things, CRPS, rheumatoid arthritis, permanent nerve damage in his left leg and foot, lower back pain, history of pulmonary embolism, Reynaud's disease and POTS.  (AR 000658).  As described below, the Social Security Administration ultimately determined that he was disabled and eligible for disability benefits under the social security regulations.  (AR 000669).

The plaintiff underwent surgery for placement of a permanent SCS on January 20, 2012. (AR 002191).  However, the device was removed nine days later due to the development of a staph infection, and on March 20, 2012, Tracia underwent a second surgery to implant a permanent SCS.  (AR 002186-88; DF ¶ 47).  Shortly thereafter, on April 18, 2012, Dr. Rathmell completed a Certification by Health Care Provider form at the request of Liberty.  (AR 002325-29; DF ¶ 50).  Therein, Dr. Rathmell stated that Tracia was suffering from "chronic lumbar radiculopathy - chronic low back pain and left leg pain"; that he was unable to sit, stand, or

walk without pain; and that he was unable to perform the essential functions of his job at

Comcast.  (AR 002326-27).  Dr. Rathmell further opined that the duration of Tracia's

impairment, and the associated limitations, were likely to be "long term."  (AR 002326).

However, he indicated that he would reassess Tracia's recovery from surgery in four weeks, and

he suggested that Tracia remain out of work on leave for another six weeks.  (AR 002327).  As

described below, Liberty's subsequent efforts to obtain updated opinion evidence from Dr.

Rathmell proved unsuccessful.

Dr. Chin, the plaintiff's primary care physician, provided a similar assessment of Tracia's

physical limitations.  During an office visit with Tracia on April 19, 2012, Dr. Chin determined

that the plaintiff was still experiencing significant back and left leg pain, and that he was unable

to sit or stand without discomfort for any period of time.  (AR 002286-87).  She also noted that

Tracia had been complaining about sudden weakness in his left leg since his surgery, which had

caused him to fall "over a dozen times" and required the use of a cane.  (Id.).  On May 1, 2012,

Liberty received a Certification by Health Care Provider form from Dr. Chin in which she indi-

cated that Tracia was suffering from chronic low back pain and left radiculopathy.  (DF ¶ 51).

She further opined that Tracia could not sit, stand or walk for more than 20 minutes due to

pain, and that he could not perform any job functions that required him to sit, stand, walk or

drive for any sustained period of time.  (Id.).

### Liberty's Investigation of Tracia's Eligibility for Ongoing Benefits

On May 17, 2012, Liberty sent a letter to Tracia regarding his claim for LTD benefits.  (AR

001137).  Therein, Liberty informed the plaintiff that he was receiving LTD benefits based on his

inability to perform the material and substantial duties of his occupation as a Business Account

Executive, but that in order to remain eligible for LTD benefits beyond twelve months, he "must be disabled from any occupation." (Id.). It further informed the plaintiff that the change in definition would occur on November 14, 2012, and that it was gathering information to assess his eligibility for benefits after that date. (Id.).

Among the forms that were attached to Liberty's letter was an Activities Questionnaire in which Tracia was asked to describe his ability to carry out various activities of daily living. (AR 001139-41). In his answers to the questions posed on the Questionnaire, Tracia indicated that he was able to sit for less than an hour, was able to stand for less than an hour, and was able to walk for fewer than 15 minutes. (AR 001139). He also indicated that he was able to perform certain activities such as driving and using a computer for limited periods of time, and was capable of performing personal hygiene. (AR 001139-40). However, he emphasized that the severe pain and nerve damage in his lower left extremity made sitting, walking and standing very painful. (AR 001141).

In addition to eliciting information from the plaintiff, Liberty continued to collect Tracia's medical records and to gather information from the plaintiff's treating physicians. (See DF ¶¶ 58-60). That information revealed that Tracia was hospitalized for nearly a week in mid-May 2012 due to acute GI bleeding. (DR ¶ 60). No source of bleeding was ever identified, and a colonoscopy detected no abnormalities. (Id.; AR 001290). However, the decision was made at that time to take Tracia off his prescribed Coumadin. (AR 001290). Shortly thereafter, in June 2012, Tracia was admitted to the hospital a second time after complaining of shortness of breath. (AR 001460-62). Again, no abnormalities were detected, and it was determined that

Tracia's symptoms were likely caused by a combination of deconditioning and another condition. (Id.).

Although Tracia recovered from his episodes of acute bleeding and shortness of breath, records pertaining to his CRPS and chronic back pain indicate that the plaintiff continued to complain of pain in his back, leg and neck notwithstanding his use of the SCS and prescription medicines. For example, but without limitation, following his discharge from the hospital in May 2012, Dr. Chin indicated that Tracia was complaining of lower back pain and sciatica on his left side, which had worsened since his hospitalization. (AR 001290). Similarly, in June 2012, Dr. Chin reported that Tracia was experiencing left sided neck pain, which was sore to the touch, and that he "[c]ontinues with chronic back/leg pain stable." (AR 001497). At that time, Tracia was taking medication, and attending physical therapy, in order to address his pain. (See AR 001514). Dr. Rathmell subsequently discontinued the use of some medication due to side effects of orthostasis, and started the plaintiff on other medication in an effort to reduce his chronic pain. (Id.).

On or about June 5, 2012, Liberty hired Hub Enterprises, Inc. ("Hub") to conduct surveillance of the plaintiff. (DF ¶ 63). Hub performed surveillance activities on June 14 and 19, 2012, but it was unable to observe the plaintiff or capture any video of him on either of those dates. (Id.; AR 002111-16). Consequently, Hub discontinued its efforts pending further instructions from Liberty. (AR 002116). There is no evidence that Liberty made any additional attempts to obtain video surveillance.

On July 27, 2012, at Liberty's request, Dr. Chin filled out a Restrictions Form concerning Tracia's physical restrictions. (AR 002088). Therein, Dr. Chin stated that the plaintiff was

suffering from neck and back pain, and that he was "unable to sit/stand for prolonged periods

[secondary to] pain." (Id.).  In addition, Dr. Chin opined that Tracia had no ability to carry out

any occupational activities on a full-time basis. (Id.).  Although there is no evidence that Liberty

ever emphasized the need for an objective measure of Tracia's limitations, or otherwise

described the criteria for filling out the Restrictions Form, it was unwilling to credit Dr. Chin's

opinions that Tracia remained disabled from working because they were based on the plaintiff's

subjective complaints of pain.

The medical records from late July and early August 2012 demonstrate that Tracia

continued to complain of severe pain in his back, leg and neck.  For example, during a visit to

Dr. Rathmell on July 31, 2012, Tracia complained of "aching low back pain with burning and

shooting pain in the left leg and back of the heel[,]" as well as ongoing neck pain radiating into

both of his upper arms and tenderness at the implant site of his SCS.  (AR 001509).  In his

progress notes, Dr. Rathmell reported that the plaintiff had recently undergone a CT of his

cervical spine, which had shown "moderately advanced degenerative changes, most

pronounced at C6/7 without central canal or foraminal stenosis."  (Id.).  He also stated as

follows with respect to the plaintiff's pain symptoms:

> This is a 50-year-old with axial [lower back pain] and left lower extremity
> neuropathic pain status post spinal cord stimulator.  There is clearly a
> myofascial component to his axial low back pain which may be addressed
> with [physical therapy], topical lidocaine, and potentially trigger point
> injections.  His neuropathic symptoms have remained unchanged.  He has
> had interval development of neck pain, but there is no evidence of nerve
> root impingement at any level.

(AR 001510).  Dr. Rathmell continued to prescribe medication in order to address the plaintiff's

pain. (Id.).

On August 7, 2012, Tracia obtained a cervical steroid injection from Dr. Rathmell.  (AR 001761-62).  Although Dr. Rathmell noted that Tracia was "getting good pain control and coverage from his spinal cord stimulator[,]" the plaintiff continued to complain of neck pain radiating to his left upper extremity and increasing pain at the site of the SCS.  (Id.).  Dr. Rathmell subsequently scheduled the plaintiff for surgery to reposition his SCS.  (See AR 001888, AR 001912).

During a follow up appointment with Dr. Chin on August 16, 2012, Dr. Chin reported that Tracia had undergone a cardiac catheterization, which was normal, that other conditions had resolved, and that his rheumatoid arthritis was stable.  (AR 001888-89).  On August 22, 2012, Liberty received medical records and a Restrictions Form from Tracia's cardiologist, Jagmeet Singh, M.D. (DF ¶ 70).  In the Restrictions Form, Dr. Singh indicated that Tracia had been diagnosed with syncope, but had no functional restrictions from a cardiac perspective. (AR 001901).  Liberty attempted to obtain a Restrictions Form from Dr. Rathmell as well.  (DF ¶ 73).  However, Dr. Rathmell informed the defendant that his office "does not provide disability/work-related evaluations," and he referred Liberty to the plaintiff's primary care physician for an assessment of the claimant's functional capacity.  (Id.).  In addition, Dr. Rathmell instructed Liberty to "Please obtain a formal capacity evaluation."  (Id.).  The record indicates that Liberty never performed a physical examination of the plaintiff, and that it relied on the flawed assessments of third-party file reviewers to determine the impact of Tracia's pain-related impairments on his ability to perform work.

**Approval of Tracia's Social Security Claim**

During the summer of 2012, Tracia received a letter from the Social Security Administration.  Therein, the agency informed him that he had met the medical requirements necessary to qualify for disability benefits, but that the medical evidence showed that his disability began on June 4, 2012 rather than on the alleged onset date of May 11, 2011.  (AR 002086).  In connection with its determination, the Social Security Administration found that Tracia suffered from a number of severe physical impairments, which were not expected to improve.  (AR 000664; AR 000669).  It also determined that Tracia "demonstrates the maximum sustained work capability" for sedentary work.  (AR 000669).  Nevertheless, because Tracia had turned 50, it concluded that the combination of his age, education, work experience and residual functional capacity rendered him disabled as of June 4, 2012.  (See AR 000668-69).

Tracia filed a request for reconsideration with the Social Security Administration in order to challenge the onset date of his disability.  (AR 001904-05).  On October 20, 2012, the agency notified Tracia that he was entitled to social security benefits beginning in November 2011. (Tr. AR 001744).  Accordingly, it determined that Tracia was disabled for purposes of his social security claim prior to the date of his fiftieth birthday.  Neither party has pointed to evidence explaining the basis for the Social Security Administration's decision on reconsideration.

Following the award of social security benefits, Liberty sent Tracia a letter in which it stated in pertinent part:

> As you may know, your employer's disability plan calls for us to reduce your disability benefits by the amount of income received from other sources, including Social Security.  Since Liberty paid you disability benefits for the period November 15, 2011 to October 14, 2012, with no reduction for Social Security benefits, we in effect advanced you the money we expected Social Security would ultimately pay.

14

(AR 001721).  Therefore, Liberty reduced Tracia's monthly LTD benefits from $3,552.49 to $1,526.49.  (PF ¶ 75).  It also demanded that Tracia repay $22,282.93 to Liberty for the alleged advancement of funds.  (Id.).

### Termination of Tracia's LTD Benefits

In the meantime, the disability case manager at Liberty who had been handling Tracia's claim requested a file review from the company's managed care department.  (DF ¶ 77).  Thus, the case manager informed the managed care department that a change in the definition of disability under the Policy would occur on November 14, 2012, such that Tracia would have to establish that he was unable to perform the Material and Substantial Duties of Any Occupation, and she asked the managed care department to provide information regarding the plaintiff's disabling condition and any restrictions or limitations.  (See id.).  She also informed the managed care department that Tracia's claim for social security disability benefits had been approved, and that "based upon multiple hospitalizations and severity of condition," she anticipated approval of Tracia's claim following the change in definition.  (Id.).  However, as detailed below, Liberty rejected Tracia's claim for LTD benefits under the "Any Occupation" standard.

The requested review of Tracia's file took place in September 2012.  (DF ¶ 78).  After describing the plaintiff's physical condition, the reviewing nurse noted that Tracia "has several chronic conditions as well as a recent acute episode of GI bleeding.  Based on his lower extremity CRPS and pain complaints, as well as the fact that he uses a cane for ambulation[,] restrictions on prolonged standing and walking are reasonable[.]"  (Id.).  She further determined that physician reviews were necessary to assess the extent of any further

restrictions or limitations.  (Id.).  Accordingly, Liberty retained an outside vendor, MES

Solutions, to perform a peer review of the plaintiff's claim file, and MES Solutions engaged

Gregg G. Marella, M.D. and Ephraim K. Brenman, D.O. to complete the work.  (See AR 001734-

43).  Dr. Marella is Board Certified in Internal Medicine, and Dr. Brenman is Board Certified in

Physical Medicine & Rehabilitation.  (AR 001738, AR 001743).   Dr. Brenman also holds a Sub

Specialty Certificate in Pain Medicine.  (AR 001743).  In connection with their reviews of the

plaintiff's file, both physicians certified that they "do not accept compensation for review

activities that is dependent in any way on the specific outcome of the case[,]" and that they

were not involved in any activities that would give rise to a conflict of interest.  (See AR 001737-

38, AR 001742-43).

Among the records which Dr. Marella reviewed were medical records from 2011 and

2012, the Activities Questionnaire that Tracia had completed, the Restrictions Forms from Drs.

Chin and Rathmell, the Certification of Healthcare Provider Form from Dr. Chin, and letters

from several of Tracia's treating physicians.  (AR 001734-35).  He also attempted to contact Dr.

Chin, but was unable to reach her.  (AR 001736).  On October 5, 2012, Dr. Marella issued a Peer

Review Report describing his conclusions.  (AR 001734-38).  As described in his Report, Dr.

Marella determined that Tracia's medical records supported a previous diagnosis of DVT and

pulmonary embolism, the etiology of which "appears to be a factor V Leiden coagulopathy."

(AR 001736).  He also determined that the records included evidence of, among other things,

cervical and lumbar disk disease, degenerative joint disease affecting the spine, tarsal tunnel

syndrome, an iron deficiency, and orthostatic hypotension, which had been evaluated by a

cardiologist.  (Id.).  However, Dr. Marella found that there was no evidence to support other

diagnoses, including POTS syndrome and rheumatoid arthritis.  (AR 001737).  Nor did he find

any evidence showing that Tracia experienced adverse side effects from any of his prescribed

medications.  (Id.).

Dr. Marella acknowledged that Tracia suffered from a number of pain-related

conditions.  (AR 001736).  In particular, he noted that the plaintiff experienced ongoing left

lower extremity pain following his tarsal tunnel release surgery, and continuing back pain

caused by his cervical and lumbar disk disease and spinal arthritis.  (Id.).  Furthermore, Dr.

Marella stated that "[o]ther pain-related conditions have included neuropathic pain, myofascial

pain and complex regional pain syndrome."  (Id.).  However, he explained that Dr. Brenman

would address Tracia's pain-related conditions.  (Id.).  Therefore, he did not evaluate whether

or to what extent the plaintiff's pain resulted in any restrictions or limitations, including any

restrictions or limitations on his ability to perform full-time work.  (See AR 001737).

As described in his Report, Dr. Marella opined that Tracia had no physical impairments

"based upon the information and records reviewed."  (Id.).  Thus, he determined that Tracia

had suffered no residual effects from his history of DVT and pulmonary embolism, and that his

June 2012 hospitalization for shortness of breath was based on deconditioning rather than an

underlying medical impairment.  (Id.).  He also found that there was no reason to recommend

any limitations based on Tracia's reported history of iron deficiency or factor V Leiden

deficiency, among other things.  (Id.).  Consequently, Dr. Marella concluded that "[t]here is no

data in the records reviewed that suggest the claimant is incapable of working in a full time

sedentary capacity."  (Id.).

Dr. Brenman also conducted a review of the plaintiff's medical records, including but not limited to, records relating to his tarsal tunnel syndrome, CRPS, complaints of back pain, and complaints of pain in his neck.  (AR 001740-41).  He attempted to contact Dr. Rathmell, but his efforts were unsuccessful.  (AR 001740).  On October 5, 2012, Dr. Brenman issued a Peer Review Report in which he stated that the plaintiff's records supported a diagnosis of left lower limb CRPS status post tarsal tunnel release and SCS implant, unexplained persistent pain despite the SCS implant, and unexplained bilateral hand numbness, tingling and stiffness .  (AR 001741).  He also opined that

> the claimant's response to treatment has been minimal.  The claimant had several hours of relief from the second lumbar sympathetic block with mild relief from utilization of the spinal cord stimulator implant.  The claimant's pain went from 10/10 to 8/10, but then Dr. Chin's notes subsequent to that stating the claimant is able to tolerate the spinal cord stimulator implant and had decreased symptoms.  There is nothing on functional objectivity.  However, it was also stated that the claimant still has pain that is mainly subjective in nature.

(AR 001741-42).   Dr. Brenman found no documentation of any significant side effects from the plaintiff's medications.  (AR 001742).

Although Dr. Brenman did not meet with the plaintiff and had no opportunity to examine him, he opined that Tracia retained the physical capacity to sit or work at a desk level, including keyboarding and reaching, without limitation.  (Id.).  He also opined that Tracia could lift and carry 10 pounds frequently; could walk or stand for 30 minutes at a time as long as he was able to take a 2-3 minute break to stop and stretch; and that he could walk or stand for a total of 4 hours in an 8 hour day.  (Id.).  In addition, Dr. Brenman stated that the plaintiff had the ability to reach below waist level, squat and climb stairs occasionally, and that he retained the capacity to carry out sustained, full-time sedentary work.  (Id.).  Thus, while

Dr. Brenman acknowledged Tracia's ongoing complaints of significant pain, he concluded that Tracia "still has mainly subjective complaints with a lack of objective findings to support the claimant's subjective complaints at this time." (Id.).

After obtaining the Peer Review Reports from the two outside physicians, Liberty referred Tracia's claim to one of its Vocational Specialists, Nancy L. Sullivan, MSEd, CDMS.  (DF ¶ 83; AR 001725-28).  Ms. Sullivan conducted a vocational analysis based on Tracia's training, education, work experience and physical capabilities, as assessed by Drs. Marella and Brenman. (Id.).  Based on her analysis, Ms. Sullivan concluded that Tracia had the ability to perform the occupations of a sales representative, a customer service representative and an order clerk. (AR 001727).  She also calculated a monthly range of pay for each of the three occupations. (Id.).

On November 9, 2012, Liberty notified Tracia that it was terminating his LTD benefits after November 14, 2012.  (AR 001716-20).  In its letter, Liberty quoted extensively from the Peer Review Reports of Drs. Marella and Brenman, and described the findings of its Vocational Specialist.  (See AR 001717-19).  As Liberty explained to the plaintiff:

> Based on our medical and vocational reviews, we have determined that you can perform, with reasonable continuity, the material and substantial duties of the above occupations based on your capacity and skill level. Therefore you do not meet Comcast Corporation's definition of disability beyond November 14, 2012 and we must deny your claim for further benefit consideration.  Benefits will be paid through November 14, 2012 and your claim is closed as of November 15, 2012.

(AR 001719).

**Tracia's Appeal of Liberty's Decision**

By letters dated May 7, 2013 and May 8, 2013, Tracia appealed Liberty's decision to deny his claim for LTD benefits.  (DF ¶ 85).  In support of his appeal, Tracia argued that he lacked the ability to engage in any sedentary occupations, and was completely impaired from working due to his various physical conditions.  (DF ¶ 86).  In particular, the plaintiff argued that he could not work due primarily to "severe rheumatoid arthritis, coagulation disorder, tarsal tunnel syndrome and other painful conditions known as Complex Regional Pain Syndrome ('CRPS') that severely limit his mobility."  (Id.).  He also claimed that he was impaired as a result of his prescribed medications.  (Id.).

In connection with the appeal, Tracia submitted a Short Form Physical Capacities Evaluation and Medical Assessment form, which had been completed by Dr. Chin on April 11, 2013.  (DF ¶¶ 87-88).  He also submitted a CD-ROM containing over 1400 pages of material. (DF ¶ 89).  The material included, inter alia, documents which Tracia described as his complete social security file, various medical records, and statements from Tracia's friends and family members describing the impact of the plaintiff's symptoms on his ability to function.  (Id.; AR 000304-07).  In addition, Tracia provided contact information for each of his current healthcare providers, along with the dates of his next scheduled appointments, and agreed to submit to an independent medical examination in the event Liberty did not find his enclosed documents sufficient to establish disability.  (AR 001679-83).  It is undisputed that Liberty never requested any such medical examination.

Significantly, in her Short Form Physical Capacities Evaluation form, Dr. Chin indicated that on a "good day" Tracia was able to sit for no more than 30 minutes at a time and no more

than 3 hours in total; was only able to stand for 10 minutes at a time and a total of 10 minutes in a day; could walk only 5 minutes at a time and a total of 15 minutes in a day; and was similarly limited in his ability to reach, drive, ride in a car and write.  (AR 001696-97).  Dr. Chin further opined that Tracia could never crouch, stoop, bend or twist; could never grasp, push and pull or engage in fine manipulation; could use a computer for no more than 1 hour on a good day; and could never lift, carry and walk with an object.  (AR 001697-98).   Furthermore, she stated that on a good day, Tracia would need to lie down for 2 hours in the morning and 2 hours in the afternoon.  (AR 001698).

As part of her evaluation, Dr. Chin provided a list of Tracia's current medications.  (AR 001698-99).  She indicated that of the 21 medications included on the list, ten of them caused cognitive impairment.  (AR 001699).  Dr. Chin opined that Tracia's medications, combined with the plaintiff's pain, would interfere significantly with his ability to carry out basic work activities. (See AR 001701-02).

Dr. Chin specifically disagreed with Liberty's assessment that the plaintiff could perform the occupations listed in its termination letter.  (AR 001702).  She stated that in her opinion Tracia was unable to return to work or to perform any work at the sedentary or light occupa-tional levels.  (AR 001702-03).  When asked "[w]hat objective medical evidence supports each condition and each area of restriction, limitation, pain and disability," Dr. Chin wrote "see extensive medical history."  (AR 001702).  Liberty contends that Dr. Chin's assessment of Tracia's physical limitations, and her opinion that he was incapable of working, were not supported by any objective medical evidence and did not support his claim of disabling physical impairments.  (DR ¶ 43).

Following its receipt of Tracia's request for an appeal, Liberty transferred the plaintiff's claim to its internal Appeals Unit.  (DF ¶ 90).   The Appeals Unit then referred Tracia's claim file to MCMC, an outside vendor.  (See AR 000085-87).  MCMC secured the services of Harold E. Gottlieb, M.D., a physician who is Board Certified in Internal Medicine, and Jamie L. Lewis, M.D., a physician who is Board Certified in Physical Medicine & Rehabilitation/Pain Medicine and Physical Medicine & Rehabilitation, for the purpose of conducting a peer review.  (DF ¶ 91; PR ¶ 91).  In connection with their reviews, both physicians certified that their "compensation for performing the subject review is not dependent, in any way, on the outcome of this case[,]" and that they did not have any relationships or affiliations that would give rise to a conflict of interest.  (AR 000164-65; AR 000180-81).

Dr. Lewis reviewed the numerous documents in the plaintiff's claim file.  (AR 000146-62).  He also attempted to speak with Dr. Chin and Dr. Rathmell, but was unable to reach either one.  (AR 000162-63).  On July 30, 2013, Dr. Lewis issued a Case Report in which he described his conclusions regarding the plaintiff's diagnoses, impairments, restrictions and limitations. (AR 000146-65).  In particular, Dr. Lewis stated that the available medical evidence supported diagnoses of status post tarsal tunnel release surgery in June 2011, which resulted in CRPS; status post spinal cord stimulator implantation; chronic back pain; and degenerative disc disease of the cervical spine.  (AR 000163).  He also opined that

> the claimant would have the sustained capacity for full time work with
> the following restrictions and limitations beyond 11/14/2012: The
> claimant would be restricted to lifting, carrying, pushing, and pulling 20
> pounds occasionally and ten pounds frequently.  The claimant would be
> restricted to standing and walking 20 minutes continuously and two
> hours cumulatively.  The claimant would be restricted to bending at and
> below the waist, balancing, stooping, kneeling, crouching and crawling
> occasionally.  The claimant should avoid climbing ladders and/or working

at unprotected heights.  The claimant would not be restricted to climbing stairs.  He would have no restrictions with reaching at or below the waist.  The claimant would be restricted to occasional use of foot controls and should avoid using heavy equipment.  He would have no restrictions with reaching overhead.  The claimant would have no restrictions with the use of the upper extremities or with sitting.  Restrictions and limitations are based on decreased strength to the left lower extremity.  Restrictions and limitations are likely permanent; however, should be reevaluated within three months of the date of this report[.]

(AR 000163-64).

As part of his review, Dr. Lewis considered whether the medical evidence supported Tracia's assertion that he experienced adverse side effects from his prescribed medications. (See AR 000164).  He determined that there were no findings from any physical or cognitive examinations, which indicated that Tracia's ability to work had been impacted by any such side effects.  (Id.).  Dr. Lewis also considered Dr. Chin's opinion that Tracia was physically incapable of working.  (See id.).  However, he found that "there are no current objective/clinical findings that would restrict the claimant from working full time with the above restrictions and limitations."  (Id.).  Accordingly, he concluded that Tracia's physical impairments did not prevent him from working.

Dr. Gottlieb reviewed the records in the plaintiff's claim file, and spoke briefly to Dr. Chin.  (AR 000166-78).  He described his findings and conclusions in a Case Report dated July 30, 2013.  (AR 000166-81).  Therein, Dr. Gottlieb stated that the records reflected a history of, among other things, tarsal tunnel syndrome status post tarsal tunnel decompression, rheumatoid arthritis, POTS, DVT, Factor V Leiden deficiency, questionable pulmonary embolism and CRPS.  (AR 000179).  However, he found that there was no evidence in the record supporting an actual diagnosis of other conditions, including rheumatoid arthritis or pulmonary embolism.

(Id.).  Dr. Gottlieb further determined that there was no evidence of cardiac or pulmonary

disease, that the plaintiff's symptoms from POTS were under control, and that the plaintiff was

at low risk of developing another DVT.  (AR 000180).

        In his Report, Dr. Gottlieb provided details of his conversation with Dr. Chin.  (AR

000178).  According to Dr. Gottlieb, Dr. Chin reportedly told him that "the major problem the

claimant has is chronic pain."  (Id.).  She also told him that in her opinion, the pain was "causing

all of his disability."  (Id.).  Dr. Gottlieb acknowledged that Tracia suffered from CRPS and

associated pain, as well as chronic back and neck pain caused by degenerative joint disease.

(AR 000180).  However, he stated that he would "defer comment on function related to CRPS

and [degenerative joint disease] to the appropriate specialist."  (Id.).  Accordingly, he did not

purport to render an opinion regarding the extent to which the plaintiff's pain affected his

ability to perform physical activities.

        Dr. Gottlieb concluded that "[b]eyond 11/14/2012, the claimant has the sustained

capacity for full time work without restrictions or limitations."  (AR 000179).  He also

determined that the medical evidence provided no support for the plaintiff's claim that he

experienced side effects from his prescribed medications.  (AR 000180).  Moreover, Dr. Gottlieb

stated that

>           [a]fter speaking with Dr. Chin, it confirms my opinion that most of the
>           claimant's complaints are self reported and not substantiated by physical
>           examination.  There has been no demonstration of muscle weakness and
>           no observed falls.  From Dr. Chin's description, the claimant all of a
>           sudden feels weak and falls down.  Dr. Chin admits that the claimant is
>           always able to get to her office and walk in without much difficulty.  The
>           medical records support that the claimant has the sustained capacity for
>           full time work without restrictions and limitations.

24

(Id.).  Accordingly, he indicated that he was not crediting Dr. Chin's assessments regarding Tracia's functional limitations.

On August 7, 2013, Dr. Chin provided additional information to Dr. Gottlieb regarding the plaintiff's medical condition.  (See AR 000139-43).  In particular, but without limitation, Dr. Chin informed Dr. Gottlieb that Tracia suffers from chronic back and leg pain, as well as weakness in his legs, that he has fallen multiple times as a result of his weakness, and that he always requires a cane for support and walks with a noticeable limp.  (AR 000143).  In addition, Dr. Chin stated that the plaintiff "has had multiple injections, underwent spinal cord stimulator which has helped mildly . . ." and is followed closely by a pain management team.  (Id.).  After reviewing the additional information, Dr. Gottlieb confirmed his opinion that Tracia was capable of carrying out full time work without any restrictions or limitations.  (See AR 000113).

Following its receipt of the Case Reports from Drs. Lewis and Gottlieb, Liberty referred the plaintiff's file to a Vocational Case Manager for review.  (AR 000050).  Based on the assessments of the two reviewing physicians, the Case Manager concluded that Tracia was not precluded from performing the occupations of a sales representative, a customer service representative and an order clerk.  (See id.).  Accordingly, the Vocational Case Manager found that Tracia was not disabled from working.

On August 12, 2013, Liberty notified Tracia that it had completed its review of his request for reconsideration, and was upholding its decision to discontinue LTD benefits after November 14, 2012.  (DF ¶ 100; AR 000088-94).  In its explanation for its decision on appeal, Liberty quoted extensively from Dr. Lewis' and Dr. Gottlieb's Case Reports, and described the

results of the analysis that was performed by the Vocational Case Manager.  (See AR 000090-

93).  It further informed the plaintiff that

> after a thorough evaluation of Mr. Tracia's claim, including all new
> information submitted for review, we have determined that his medical
> condition is not of a nature and severity that would preclude him from
> performing the material and substantial duties of the occupations
> identified as being within his functional capacity and vocational skills.  As
> such, the denial of LTD benefits beyond November 14, 2012 has been
> maintained.

(AR 000093).

In its August 12, 2013 notice, Liberty stated that it had fully considered the Social

Security Administration's decision to approve Tracia's claim for disability income benefits.  (Id.).

However, it explained that the Social Security Administration affords special deference to the

opinions of treating physicians over those of non-treating physicians, and that the so-called

"treating physician rule" does not apply to claims for ERISA benefits.  (Id.).  Liberty also

explained that an award of social security benefits is not determinative of a claim for ERISA

benefits under the terms and conditions of the Policy, and that its decision was based upon

different and updated medical and vocational information, which would not have been

considered by the Social Security Administration.  (Id.).  Therefore, it declined to adopt the

conclusion that had been reached by the Social Security Administration.

On December 23, 2013, Tracia filed the instant action challenging Liberty's decision to

deny his claim for LTD benefits under the Policy.  There is no dispute that Tracia has exhausted

all of his administrative remedies, and that his present claims in this case are ripe for review

pursuant to ERISA.

Additional factual details relevant to this court's analysis are provided below where appropriate.

### III.  ANALYSIS

#### A.    Standard of Review

Each of the parties has moved for summary judgment on Tracia's claims for relief under ERISA.  In the context of a case involving the denial of ERISA benefits, "the summary judgment analysis . . . differs from the ordinary summary judgment inquiry[.]"  Gross v. Sun Life Assur. Co. of Canada, 734 F.3d 1, 16 (1st Cir. 2013).  "In these cases, 'where review is based only on the administrative record before the plan administrator and is an ultimate conclusion as to disability to be drawn from the facts, summary judgment is simply a vehicle for deciding the issue.'"  Id. (quoting Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005)).  Thus, "the district court sits more as an appellate tribunal than as a trial court.  It does not take evidence, but, rather, evaluates the reasonableness of the administrative determination in light of the record compiled before the plan fiduciary."  Young v. Aetna Life Ins. Co., – F. Supp. 3d –, Civil Action No. 4:13-cv-40154-TSH, 2015 WL 7194812, at *12 (D. Mass. Nov. 16, 2015) (quoting Leahy v. Raytheon Co., 315 F.3d 11, 18 (1st Cir. 2002)) (alteration omitted).

A challenge to a denial of benefits under ERISA "is to be reviewed de novo 'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'"  McDonough v. Aetna Life Ins. Co., 783 F.3d 374, 379 (1st Cir. 2015) (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989)).  In cases where the plan delegates such authority to the administrator, "the district court must uphold the administrator's decision unless it is 'arbitrary,

capricious, or an abuse of discretion.'" Young, 2015 WL 7194812, at *12 (quoting D & H

Therapy Assoc., LLC v. Boston Mut. Life Ins. Co., 640 F.3d 27, 34 (1st Cir. 2011)).  In the instant

case, Tracia argues that Liberty bears the burden of demonstrating that it is entitled to the

more lenient, discretionary standard of review.  (Pl. Mem. (Docket No. 33) at 14-15).  However,

he has not made any argument in favor of applying a de novo standard.  (See id.).  Nor does he

dispute that under the express terms of the Policy, "Liberty shall possess the authority, in its

sole discretion, to construe the terms of this policy and to determine benefit eligibility

hereunder[,]" and "Liberty's decisions regarding construction of the terms of this policy and

benefit eligibility shall be conclusive and binding."  (DF ¶ 3; PR ¶ 3).  Because the Policy gives

discretionary authority to Liberty, this court finds that Liberty's denial of benefits must be

evaluated under the arbitrary and capricious standard of review.

Pursuant to the applicable standard, the court must determine whether the claims

administrator's decision "is reasonable and supported by substantial evidence on the record as

a whole." McDonough, 783 F.3d at 379.  "Substantial evidence means evidence reasonably

sufficient to support a conclusion." Young, 2015 WL 7194812, at *12 (quoting Doyle v. Paul

Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998)) (punctuation omitted).  However,

"[s]ufficiency . . . does not disappear merely by reason of contradictory evidence. . . .  [The]

question [is] not which side [the court] believe[s] is right, but whether [the administrator] had

substantial evidentiary grounds for a reasonable decision in its favor.'" Id. (quoting Doyle, 144

F.3d at 184) (alterations in original).  The claimant has the burden of proving that he is disabled

within the meaning of the Policy.  See Maher v. Mass. Gen. Hosp. Long Term Disability Plan, 665

F.3d 289, 293 (1st Cir. 2011) (explaining that plaintiff "has the burden of proving her disability").

While the standard applied to Liberty's decision is deferential, "there is a sharp distinction between deferential review and no review at all." Young, 2015 WL 7194812, at *14 (quoting Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan, 705 F.3d 58, 62 (1st Cir. 2013)). As the First Circuit has explained, "[a]pplying a deferential standard of review does not mean that the plan administrator will prevail on the merits. In order to withstand scrutiny, the plan administrator's determinations must be reasoned and supported by substantial evidence." Colby, 705 F.3d at 62 (internal quotation marks and citations omitted). In other words, the administrator's determinations "must be reasonable." Id.

Finally, in evaluating a challenge involving ERISA benefits, "it [is] useful to consider other ERISA provisions." Buffonge v. Prudential Ins. Co. of Am., 426 F.3d 20, 30 (1st Cir. 2005). In particular, Section 503 of ERISA provides in relevant part that "every employee benefit plan shall . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for *a full and fair review* by the appropriate named fiduciary of the decision denying the claim." Id. (quoting 29 U.S.C. § 1133). The purpose of this requirement is "to provide claimants with enough information to prepare adequately for further administrative review or an appeal to the federal courts, and to protect a plan participant from arbitrary and unprincipled decision making." Magee v. Metro. Life Ins. Co., 632 F. Supp. 2d 308, 317 (S.D.N.Y. 2009) (internal quotation marks and citations omitted). Thus, the court "must [remain] mindful that '[t]he statute and the regulations were intended to help claimants process their claims efficiently and fairly [and] they were not intended to be used . . . as a smoke screen to shield [the benefits

plan] from legitimate claims.'" Id. (quoting Juliano v. The Health Maintenance Org. of N.J., Inc., 221 F.3d 279, 287 n.1 (2d Cir. 2000)) (alterations and punctuation in original).

    **B.**    **Impact of Liberty's Structural Conflict on the Standard of Review**

       Tracia argues that Liberty's role as both the claims administrator and the provider of benefits under the Policy undermined its ability to act as an unbiased fiduciary with respect to the decision making process, and deprived the plaintiff of his right to a full and fair review.  (See Pl. Mem. at 17-19).   Thus, he claims that Liberty's decision to deny his claim for benefits must be overturned because it was tainted by the presence of an inherent conflict of interest.  "The Supreme Court has held that, in the context of ERISA, when an entity both pays out benefits under a disability plan and administrates claims under that plan, it operates under a structural conflict of interest."  Young, 2015 WL 7194812, at *18 (citing Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 108, 128 S. Ct. 2343, 2346, 171 L. Ed. 2d 299 (2008)).  It also has held that, when such a conflict exists, "the reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits[.]"  Glenn, 554 U.S. at 108, 128 S. Ct. at 2346.  "This factor, however, does not change the applicable standard of review, and its significance 'will depend upon the circumstances of the particular case.'"  Young, 2015 WL 7194812, at *18 (quoting Glenn, 554 U.S. at 108, 115, 128 S. Ct. at 2346, 2350).  "A conflict is 'more important . . . where circumstances suggest a higher likelihood that it affected the benefits decision.'  On the other hand, the conflict 'prove[s] less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy.'"  Petrone v. Long Term Disability Income Plan for Choices Eligible Emps. of Johnson & Johnson & Affiliated Cos., 935 F. Supp. 2d 278, 288 (D.

Mass. 2013) (quoting Glenn, 554 U.S. at 117, 128 S. Ct at 2351).  The plaintiff "bears the burden

of showing that the conflict influenced Liberty's decision."  Cusson v. Liberty Life Assur. Co. of

Boston, 592 F.3d 215, 225 (1st Cir. 2010), abrogated on other grounds by Montanile v. Bd of

Trs. of Nat'l Elevator Indus., 136 S. Ct. 651 (2016).

In the instant case, Tracia does not dispute that Liberty employed procedures that were

designed to reduce the impact of its structural conflict on the decision making process.  For

instance, the record demonstrates that Liberty retained third party physicians to review the

plaintiff's claims file.  Each of those physicians certified that his compensation was not

dependent upon the outcome of his review, and that he was not affiliated with any individuals

or entities that would give rise to a conflict of interest.  (AR 000164-65; AR 000180-81; AR

001737-38; AR 001742-43).  Additionally, the record shows that Liberty sent Tracia's appeal to

an Appeals Unit, which was separate from the unit that had made the initial decision to

terminate his LTD benefits.  (See DF ¶ 90).  Measures such as these are sufficient to limit the

weight accorded to the structural conflict.  See Salvador v. Liberty Life Assur. Co. of Boston, C.A.

No. 12-cv-30196-MAP, 2014 WL 3749206, at *8 (D. Mass. July 28, 2014) (slip op.) (finding that

referral of plaintiff's claim to an independent physician and use of separate appeals unit

mitigated the impact of Liberty's structural conflict of interest).

Tracia also argues that the manner in which Liberty conducted its review establishes

that its decision was influenced by its conflict of interest.  In particular, Tracia contends that

Liberty manifested bias by ignoring medical evidence that was favorable to the plaintiff,

engaging in a vocational review that "failed to follow the 'gainful' language in the LTD Plan[,]"

failing to conduct a physical examination of the plaintiff, and failing to adequately address the

Social Security Administration's decision.  (Pl. Mem. at 16-19).  He further contends that

Liberty's decision to impose an "objective evidence" requirement upon him, and its failure to

weigh HUB Enterprises' surveillance video in his favor, provide additional evidence of bias

arising out of its structural conflict of interest.  (Pl. Opp. Mem. (Docket No. 39) at 17-18).  For

the reasons detailed below, this court finds that Liberty's decision to deny Tracia's claim for LTD

benefits was unreasonable.  Therefore, it is not necessary to determine whether or to what

extent Liberty's conflict of interest was a factor in that decision.  See Young, 2015 WL 7194812,

at *19 (declining to delve into an examination of the defendant's conflict of interest where

court concluded, "without considering this additional factor[,]" that the defendant abused its

discretion by failing "to provide a principled, substantiated review [of plaintiff's claim] as

mandated by ERISA").

### C.    Whether Liberty's Decision Was Based on Substantial Evidence

Although Tracia has challenged Liberty's decision on a number of different grounds,[5] the

fundamental issues presented by the parties' motions are whether Liberty unfairly imposed an

objective evidence requirement on Tracia that was inconsistent with terms of the Policy, and

whether its decision to terminate his LTD benefits for failing to provide objective support for his

claim that he was unable to perform full-time sedentary work was based on substantial

evidence.  For the reasons that follow, this court finds that while Liberty was able to impose an

objective requirement under the Policy, its failure to advise Tracia of the type of evidence that

---

[5]  In his opposition to Liberty's motion for summary judgment, Tracia argues that Liberty abused its discretion by
ignoring evidence which was favorable to the plaintiff, by failing to provide an adequate explanation for rejecting
the Social Security Administration's decision that Tracia was disabled, and by failing to justify its rejection of Dr.
Chin's and Dr. Rathmell's opinions that Tracia could not work.  (See Pl. Opp. Mem. at 4-11).  Because this court
finds that Liberty's decision was not based on substantial evidence and cannot be upheld on appeal for the reasons
set forth herein, it is not necessary to address each of these arguments separately.

was necessary to fulfill this requirement was unreasonable.  Moreover, as detailed below,

Liberty's termination decision was not based on substantial evidence.  Therefore, this matter

must be remanded for further evaluation.

### Objective Evidence Requirement

Tracia argues, as a threshold matter, that Liberty abused its discretion by demanding

objective evidence of disability even though the Policy contained no such requirement.  (See Pl.

Opp. Mem. at 1, 12-13).  Specifically, the plaintiff contends that "[t]he definition of Disability

nowhere demands either 'objective medical evidence' or 'objective evidence of disability[,]'"

and that he was only required to prove "that he could not work due to Injury or Sickness."  (Id.

at 12-13).  "[T]he discretion of a plan administrator is cabined by the text of the plan and the

plain meaning of the words used."  Colby, 705 F.3d at 65.  However, "so long as a plan

administrator's interpretation of the Plan language is reasonable, a court must defer to that

interpretation.  Whether Plaintiff's alternate interpretation is reasonable is irrelevant: so long

as Defendant['s] interpretation is also reasonable, the court must accept it."  Salvador, 2014 WL

3749206, at *10 (internal citation omitted).  Here, Liberty reasonably interpreted the Policy to

require objective evidentiary support for Tracia's claim of disability.   Nevertheless, this court

finds that its decision was arbitrary and capricious because it failed to inform Tracia what type

of objective evidence would be required to support his claim of disabling pain.

Pursuant to the terms of the Policy, eligible employees seeking LTD benefits must

provide Liberty with "Proof of continued . . . Disability[.]"  (AR 000022).  For purposes of Tracia's

claim, the Policy defines the term "Disability" to mean that the claimant, "as a result of Injury or

Sickness, . . . is unable to perform, with reasonable continuity, the Material and Substantial

Duties of Any Occupation." (AR 000009). The Policy further provides that "'Proof' means the evidence in support of a claim for benefits and includes, but is not limited to, the following: . . . the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or *other forms of objective medical evidence* in support of a claim for benefits." (AR 000013 (emphasis added)). Furthermore, under the Policy, "Proof must be submitted in a form or format *satisfactory to Liberty*." (Id. (emphasis added)). It was not unreasonable for Liberty to interpret this language to require objective proof of Tracia's inability to perform work at the sedentary level of exertion, and to demand objective medical evidence substantiating Tracia's claim for LTD benefits.

Tracia also argues that it was impermissible for Liberty to require objective evidence of medical conditions, such as CRPS, which are characterized by chronic pain and cannot be established by objective medical findings. (See Pl. Opp. Mem. at 13-16). The First Circuit has held that "findings of chronic pain may not automatically be dismissed by a benefits administrator for lack of confirmable symptoms." Gross, 734 F.3d at 22. Not surprisingly, "[s]ubjectively painful conditions like CRPS . . . pose difficult problems for private disability insurance plan administrators and the Social Security Administration, who understandably seek to make decisions based on the most objective evidence available." Holmstrom v. Metro. Life Ins. Co., 615 F.3d 758, 769 (7th Cir. 2010). In this case, however, Liberty does not dispute that Tracia's medical records support a diagnosis of CRPS and chronic back pain, among other conditions, and are replete with references to Tracia's subjective complaints of pain. (See Def. Mem. (Docket No. 30) at 8-13). Instead Liberty argues that it was justified in terminating Tracia's

benefits because he failed to submit objective evidentiary support for his claim that his chronic pain rendered him incapable of performing full-time sedentary work.  (See id. at 16-18).

The First Circuit "draws a distinction between requiring objective evidence of the diagnosis, which is impermissible for a condition . . . that does not lend itself to objective verification, and requiring objective evidence that the plaintiff is unable to work, which is allowed."  Cusson, 592 F.3d at 227 (quoting Denmark v. Liberty Life Assur. Co., 481 F.3d 16, 37 (1st Cir. 2007)).  Consequently, it was well within Liberty's discretion to require objective evidence showing that Tracia lacked the ability to engage in gainful work activity.  The problem with Liberty's argument is that it never informed Tracia what evidence was required to make the necessary showing in light of his subjective symptoms, and it relied on the opinions of reviewing physicians who never examined the plaintiff or otherwise obtained objective evidence regarding the effect that the plaintiff's pain had on his ability to engage in work-related functional activities.  Under these circumstances, this court finds that its decision to deny his claim for LTD benefits after November 14, 2012 was not supported by substantial evidence.

### Lack of Adequate Notice

"While requiring plan participants to submit evidence of objective measures of func-tional limitations may be reasonable, participants must be informed of those requirements."  Magee, 632 F. Supp. 2d at 318.  Here, Liberty failed to specify what type of evidence was necessary in order for the plaintiff to substantiate his claims of disabling pain.  For example, at the time Liberty notified Tracia that it was gathering information to assess his eligibility for LTD benefits beyond November 14, 2012, it asked him to fill out an Activities Questionnaire

describing his subjective assessment of his ability to carry out activities of daily living.  (AR

001137-41).  However, it did not inform him of the need for objective evidence of his functional

limitations.  (See id.).  Additionally, throughout its investigation of Tracia's claim, Liberty

obtained evidence from Dr. Chin reflecting her assessments of Tracia's functional capacity.  (See

DF ¶¶ 51, 67, 88).  However, there is no evidence that it provided any instructions to Dr. Chin

regarding the parameters for completing those assessments, or that it directed Tracia to obtain

a formal functional capacity evaluation from Dr. Chin or an independent physician.

In its November 9, 2012 letter to Tracia informing him that it was terminating his LTD

benefits, Liberty quoted Dr. Brenman's opinion that "the claimant still has mainly subjective

complaints with a lack of objective findings to support the claimant's subjective complaints at

this time[,]" as well as Dr. Marella's opinion that "[t]here is no data in the records reviewed that

suggest the claimant is incapable of working in a full time sedentary capacity."  (See AR 001718-

19).  It further informed Tracia that he had the right to request a review of its denial by writing

to Liberty within 180 days following his receipt of the letter and "stat[ing] the reasons why you

feel your claim should not have been denied."  (AR 001720).  As Liberty specified:

> In your request for review please include the following documentation:
> Dr. Singh's office notes, lab reports, and diagnostic test reports after the
> August 9, 2012 appointment; Dr. Chin's office notes, lab reports, and
> diagnostic testing after the August 16, 2012 appointment; Dr. Rathmell's
> office notes, lab reports, and diagnostic test reports after the August 7,
> 2012 appointment; any other medical record from any other provider
> from May 2011 to the present; as well as any additional information
> which you feel will support your claim.

(Id.).  Again, however, Liberty failed to indicate what type of "objective findings" or "data"

would have been necessary to establish disability based on the plaintiff's allegations of pain.

This court finds that its failure to do so deprived Tracia of a full and fair review under ERISA.

36

See Magee, 632 F. Supp. 2d at 318-19 (concluding that insurer's failure to explain what criteria it was applying to establish the severity of plaintiff's impairments, or what evidence would be necessary to satisfy the need for objective measures of plaintiff's functional limitations, "is further indication that its decision was arbitrary and capricious").

### Liberty's Reliance on Opinions of Reviewing Physicians

Liberty argues that the assessments rendered by the independent file reviewers, Drs. Marella, Brenman, Gottlieb and Lewis, and the reports provided by its two vocational experts, fully supported its conclusion that Tracia was not disabled. (See Def. Mem. at 8-13). It further contends that its decision to credit the opinions of the reviewing physicians over those of Dr. Chin were reasonable and entitled to deference because neither Dr. Chin nor any of Tracia's other treating physicians presented objective findings showing that Tracia's conditions precluded him from performing sedentary work. (Id. at 13-16). In addition to Liberty's failure to specify the type of objective evidence necessary to support a claim for benefits based on pain, this court finds that the reports of the reviewing physicians, as well as the reports of the vocational experts, were not reliable, and that Liberty's decision to credit those reports was not supported by substantial evidence.

This court finds, as an initial matter, that the opinions of Dr. Marella and Dr. Gottlieb provide no reasonable support for the denial of Tracia's claim for LTD benefits. The critical issue presented by the record on summary judgment is whether the plaintiff's chronic pain and treatment therefor rendered him incapable of performing sedentary work after November 14, 2012. Neither Dr. Marella nor Dr. Gottlieb purported to render an opinion as to what impact, if any, the plaintiff's pain had on his ability to carry out work-related functions. (See AR 000180;

AR 001736).  While acknowledging the plaintiff's diagnoses of pain-related conditions and his complaints of chronic pain, Dr. Marella explained that he was leaving it up to Dr. Brenman to address Tracia's pain-related impairments.  (AR 001736).  Similarly, Dr. Gottlieb noted that Tracia suffers from CRPS and associated pain, as well as from chronic back and neck pain stemming from degenerative joint disease, but he stated that he would "defer comment on function" relating to Tracia's pain-related medical conditions to "the appropriate specialist." (AR 000180).  As a result, their opinions ignore the central issue in this case, and provide no support for Liberty's decision to deny Tracia's claim of disability.

This court also finds that the conclusions of Drs. Marella and Gottlieb regarding the extent of Tracia's physical limitations are inconsistent with the overwhelming weight of the record.  Dr. Marella determined, based on his review of Tracia's claims file, that the plaintiff had "no limitations or impairments that need to be in place."  (AR 001737).  Similarly, Dr. Gottlieb concluded that after November 14, 2012, Tracia had "the sustained capacity for full time work without restrictions or limitations."  (AR 000179).  These assessments are entirely at odds with the plaintiff's medical records, which document a number of severe impairments and support at least some amount of restrictions.  They are also inconsistent with the opinions of nearly all of the remaining health professionals who treated the plaintiff or reviewed his case file, including those who were working for Liberty or were retained to review the file on behalf of the defendant.[6]  For this reason as well, Liberty's reliance on their opinions was arbitrary and capricious.

---

[6]  As described above, only Dr. Singh, the plaintiff's cardiologist, opined that Tracia had no functional restrictions. However, his assessment was based only on Tracia's cardiac conditions.  (See AR 001901).

Liberty's reliance on the opinions of Drs. Brenman and Lewis is similarly troubling.  Both of those physicians credited the plaintiff's diagnosis of CRPS and acknowledged his consistent complaints of pain, but determined that Tracia's pain was mostly subjective in nature and rejected Dr. Chin's assessments that Tracia was unable to work based on the lack of objective support.  (AR 001741-42; AR 000163-64).  Nevertheless, both Dr. Brenman and Dr. Lewis found, without performing a physical examination or evaluation of Tracia's functional abilities, that Tracia had the capacity to perform work at the sedentary level of exertion.  (See id.).  While there was nothing improper about their failure to adopt Dr. Chin's opinion, this court finds that their conclusions that Tracia could carry out sedentary work were seriously flawed.

The Supreme Court has held that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician."  Buffonge, 426 F.3d at 27 (quoting Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834, 123 S. Ct. 1965, 1972, 155 L. Ed. 2d 1034 (2003)).  This is particularly true where, as here, the record contains evidence indicating that Dr. Chin's assessment regarding the plaintiff's functional limitations was based on the plaintiff's subjective reports rather than her own observations or other objective criteria.  (See AR 000180).  Nor is it improper for a claims administrator to credit the reports of non-examining reviewing physicians, as long as those reports are reliable.  Cusson, 592 F.3d at 226-27 (finding claims administrator's reliance on reports of non-examining physicians appropriate where court could see no reason why those reports were unreliable).  In the instant case, however, the reports of Drs. Brenman and Lewis are unreliable.

Both Dr. Brenman and Dr. Lewis found that there was no objective measure of Tracia's functional abilities in the claims file, and consequently no support for the plaintiff's claim that

he was unable to work.  However, they also concluded, based on the very same record, that the plaintiff retained the functional capacity to carry out full-time sedentary work.  While it arguably may have been unreasonable for Dr. Chin to conclude, in the absence of objective evidence, that Tracia lacked the capacity to perform work at any level of exertion, it was equally unreasonable for the reviewing physicians to conclude, in the absence of such evidence, that Tracia retained the capacity to work notwithstanding his complaints of debilitating pain.  Therefore, this court finds that Liberty's reliance on their assessments was not supported by substantial evidence in the record.  Furthermore, because the opinions of Liberty's vocational experts were premised upon the faulty assessments of the file reviewers, this court finds that Liberty acted improperly by adopting their conclusions that Tracia had the ability to perform the sedentary occupations of a sales representative, customer service representative and an order clerk, and by denying Tracia's claim for LTD benefits on that basis.

### D.    Selection of an Appropriate Remedy

Having concluded that Liberty's decision was arbitrary and capricious, this court must determine an appropriate remedy.  The First Circuit has adopted a "flexible approach" which allows courts "'considerable discretion' to craft a remedy after finding a mistake in the denial of benefits."  Buffonge, 426 F.3d at 31 (quoting Cook v. Liberty Life Assur. Co., 320 F.3d 11, 24 (1st Cir. 2003)).  Thus, "[t]here is no question that this court has the power to remand to the claims administrator; it also has the power, in appropriate cases, to award benefits to the disability claimant."  Id.  Tracia asserts that "[t]he appropriate remedy is reinstatement of benefits retroactive to the date of termination."  (Pl. Mem. at 20).  This court disagrees, and finds that

the circumstances of this case warrant a remand to the claims administrator for further administrative proceedings.

Generally, where the court "cannot 'say with assurance that [the claims administrator] denied [the claimant] benefits to which [he] was entitled,'" but still has doubts about the justification for the claims administrator's decision, a remand is the appropriate remedy. <u>Gross</u>, 734 F.3d at 27 (quoting <u>Maher</u>, 665 F.3d at 295). In this case, it is far from clear whether the plaintiff is entitled to benefits. As described above, the record contains no objective findings regarding the extent to which Tracia's pain interferes with his ability to perform work-related activities. It also contains conflicting evidence regarding the nature and degree of his symptoms. For example, but without limitation, the record shows that on May 22, 2012, Tracia met with Nasima Khatoon, M.D. (AR 002121-23). Following an examination, Dr. Khatoon reported that Tracia was "[u]p and about more than 50% of waking hours[,]" and was "[a]mbulatory and capable of all self care but [was] unable to carry out any work activities." (AR 002122). Dr. Khatoon also found that Tracia had a normal gait and station, normal range of motion and normal strength and tone. (<u>Id</u>.). On the other hand, during a follow-up visit with Dr. Rathmell on July 31, 2012, Dr. Rathmell found that Tracia was continuing to suffer from axial lower back pain and left lower extremity neuropathic pain despite the use of an SCS and medicine, and that he was complaining of ongoing neck pain radiating to both of his upper arms. (AR 001509-10). Although Dr. Rathmell also noted that Tracia's gait was normal, his records provide no further insight with respect to the plaintiff's functional abilities. (<u>See</u> <u>id</u>.). Therefore, it is not possible to say with any assurance that Liberty improperly denied Tracia benefits to which he was entitled. The matter will be remanded to the defendant for further consideration of the

plaintiff's claim for LTD benefits.  Liberty shall identify the type of objective evidence it requires, and Tracia shall be given the opportunity to provide such information prior to Liberty's reconsideration of his claim.

## IV.  CONCLUSION

For all the reasons detailed above, the "Plaintiff's Motion for Judgment on All Counts in His Complaint" (Docket No. 28) is ALLOWED IN PART and DENIED IN PART, and the "Defendants' Motion for Summary Judgment" (Docket No. 29) is DENIED.  This case will be remanded to the claims administrator for further proceedings consistent with this decision.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge